3 A.3d 403

**William Edward DILLARD**

v.

**STATE of Maryland.**

**No. 50, Sept. Term, 2009.**

Court of Appeals of Maryland.

Aug. 25, 2010.

448

Brian L. Zavin, Asst. Public Defender (Elizabeth L. Julian, Acting Public Defender, of Baltimore, MD), on brief, for Petitioner.

Sarah Page Pritzlaff, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, of Baltimore, MD), on brief, for Respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

GREENE, J.

We are asked to determine whether the trial judge in the present case abused his discretion in denying William Edward Dillard's ("Defendant" or "Dillard") motion for a mistrial when, following the testimony of the State's primary law enforcement witness, two jurors patted the witness on the back and commended him for doing a "good job." In the present case, the trial judge failed to conduct a *voir dire* examination of the jurors to determine whether the jurors had reached a premature conclusion as to Dillard's guilt or formed

fixed opinions about the evidence. The contact between the jurors and the State's witness raised questions about the jurors' ability to reach an impartial verdict, and the trial judge failed to resolve the factual questions raised by the contact. Accordingly, we shall hold that, in failing to conduct an inquiry, the trial judge abused his discretion in denying Dillard's motion for a mistrial. Contacts between jurors and witnesses during the course of a trial about the content of a witness's testimony create an appearance of impropriety that undermines the integrity of the trial system, and thus factual questions about the jurors' ability to reach an impartial verdict that are raised by such contacts must be resolved by the trial judge.

### Facts and Procedural History

The underlying facts of the present case, as established at trial, are not at issue before this Court. We adopt the facts as presented by the Court of Special Appeals:

[O]n the evening of November 30, 2006, officers from the Charles County Sheriff's Office executed a search and seizure warrant for 3125 Lewis Place. The warrant was issued based on police surveillance of the residence and their observation of what appeared to be several drug transactions. The residents of the house included Dillard's cousin, Bertha Newman, who owned the house; her sons, Taras and Brian Gray; and Taras's girlfriend and daughter. Dillard was not listed on the warrant, but he was present at the house when the police conducted their surveillance, and he was arrested when the police executed the warrant.

Corporal Haven Smith, Jr., of the Charles County Sheriff's Office Narcotics Enforcement Section, was the State's primary witness [at Dillard's trial].... [Smith testified that], at around 5:00 p.m. Dillard pulled up to the house in a Pontiac Bonneville, spoke to the three men on the porch, and then went inside, without knocking.... [After some time], Dillard emerged from the house and approached the men in the Taurus [which had pulled into the driveway while he was inside]. From a distance of about twenty to

twenty-five feet, Smith saw [one of the vehicle's occupants] hand something to Dillard, which Dillard put in his "front right ... pants pocket." In exchange, Dillard placed a small object in Stapleton's hand. From his vantage point, Smith could not identify the object. But, based on his training, Smith concluded that Dillard and [the vehicle's occupant] had engaged in a drug transaction.

. . .

After observing what he believed to be several drug transactions over the course of a few hours, Smith decided to execute the warrant.... After the Team secured the house, Smith and other officers entered and saw Dillard "on the ground in the kitchen in handcuffs." Smith recovered from [Dillard's] "left sock" a "bag of marijuana," valued at $20, as well as $154 in cash from his right front pants pocket.... In the rear middle bedroom [where Smith had seen a light go on and off prior to Dillard's transactions], Smith observed "a shot gun—rested up against the wall." With regard to the search of that bedroom, Smith testified: "From the closet area [Captain Daniel Gimler and I] recovered—a quantity [1.3 grams] of crack cocaine, two digital scales with [cocaine] residue on them, numerous new and unused small glassine baggies. Two razor blades with— what appeared to be [cocaine] residue on them and—a small quantity of marijuana.... And some rubber gloves."

*Dillard v. State,* No. 1578, slip. op. at 2–6 (Md.Ct.Spec.App. Feb. 11, 2009) (footnote omitted).

Dillard was charged with possession of cocaine with the intent to distribute, possession of cocaine, possession of marijuana, conspiracy to distribute cocaine, possession of paraphernalia, and possession of a firearm in relation to drug trafficking. Detective Smith, the State's primary witness, testified to the facts described above at Dillard's trial. The day after Smith testified, the State called Sergeant Robert Kiesel as an expert in the distribution and use of crack cocaine. Kiesel, the State's final witness, testified to the "street value" of the drugs and his opinion that the drugs recovered in the raid were intended for distribution. After

the parties completed their questioning of Sergeant Kiesel, the court recessed for lunch.

The incident underlying the controversy before us occurred during the lunch recess. Upon returning from the recess, the State informed the trial judge about the incident and the following occurred outside of the jury's presence:

The Court: Okay. You ladies met with me and said there was an issue that probably needs addressing—before we bring the jury back in here. Who wants to go first? Ms. Piper [State's Attorney] you were the reporter.

[The State]: Yes, Your Honor. Your Honor—Detective Smith and Sergeant Kiesel—reported to me that—when we broke for lunch that—two jurors walked by—as the jurors were walking by two of them—patted—Detective Smith on the back and said, "Good job." In response Detective Smith did nothing. He didn't comment on it. He didn't look at them. He looked—he kept—they were walking by. He kept walking his direction, they're walking opposite directions. He didn't acknowledge it. He didn't comment on it. He didn't say anything—and—that's what we have.

The Court: Should any kind of inference be drawn from that kind of remark?

[The State]: I don't think so Your Honor.

The Court: Ms.—Cawood [defense counsel], what's your reaction?

[Defense]: Your honor, I think that it—these two particular jurors obviously are not—inclined to follow the proper court protocol and I'm concerned that the jurors may poison the rest of the jury with their type of behavior and tactics and as such I[ ] ... request a mistrial because there's only one alternate juror and there were two jurors who were apparently engaged in this kind of—jury misconduct. Though I would acknowledge that there is no inappropriate State action, the action of the jurors themselves would be the basis for my Motion for a Mistrial.

In the alternative, what I would request and I would request this while still maintaining my Motion for a Mistri-

al,—that one of the jurors—perhaps whichever one initiated it, be replaced with the alternate as there is one alternate. That may at least break up the—seeming monopoly of these two jurors.

The State responded, arguing that there was no misconduct because the jurors had not violated any instruction from the court. Further, the State asserted that there was no taint because the jurors had not made a specific comment about their opinions of Dillard's guilt, and even if the comments demonstrated prejudice, a curative instruction would correct the problem.

At Dillard's request, the trial judge brought the jurors into the courtroom so Detectives Smith and Kiesel could identify, for the court, the jurors that contacted him. Dillard's attorney then questioned the officers:

[Defense]: Which [juror said "Good job"] first?

Detective Kiesel: 194.

Detective Smith: The elderly gentleman said it to me first. The other juror wasn't in view when he said it. The other juror was around the corner. It was in passing. Everybody was walking by.

Dillard then renewed the Motion for a Mistrial, arguing that the juror's contact demonstrated that the jurors might be "influenced" by each other, or that they had discussed the merits of the case prematurely.

The trial judge denied Dillard's request for a mistrial, and declined Dillard's request to replace one of the two jurors involved in the incident with the alternate. The jury convicted Dillard of possession of cocaine with the intent to distribute, possession of cocaine, and possession of marijuana.[1] The jury found Dillard not guilty of conspiracy to distribute cocaine, possession of paraphernalia, and possession of a firearm in relation to drug trafficking. The court sentenced Dillard to

---

1. The Circuit Court merged the conviction for possession into possession with intent to distribute.

twelve years' imprisonment, with all but six years suspended, and five years of supervised probation upon release.[2]

Dillard appealed his conviction to the Court of Special Appeals, which affirmed the trial court's judgment. In an unreported opinion, the intermediate appellate court held that, although Dillard preserved for appellate review his claim that the trial judge abused his discretion by failing to grant his motion for a mistrial, Dillard failed to preserve his complaint that the trial judge did not conduct a *voir dire* examination of the jurors because he failed to request such an examination. Further, the intermediate appellate court held that the trial judge did not err or abuse his discretion in denying Dillard's request for a mistrial. In the intermediate appellate court's view, the jurors in question did not engage in any misconduct because they did not violate the trial judge's instructions by talking to Detective Smith. Additionally, according to the Court of Special Appeals, the jurors' conduct was "neither nefarious nor prejudicial" on its face, and was not extended in length. Thus, the intermediate appellate court held that Dillard had not advanced a reason to presume prejudice based on the jurors' limited contact with Detective Smith. Further, the Court of Special Appeals pointed out that it is not improper for the jurors to have tentative opinions as to the question of Dillard's guilt or innocence. The juror's comments did not demonstrate bias, in the intermediate appellate court's view, but rather were merely an instinctive human reaction to the testimony. Finally, the intermediate appellate court pointed out that the trial judge's subsequent instructions on the State's burden and the presumption of innocence were presumed to be followed by the jury.

Dillard petitioned this Court for a writ of certiorari. We granted Dillard's petition to resolve the following question: "Should prejudice to Petitioner be presumed where, following the testimony of the State's primary law enforcement witness,

---

2. Dillard also receive a one year prison sentence for possession of marijuana, to be served concurrently.

two jurors patted the witness on the back and commended him for doing a 'good job'?" [3]

## Standard of Review

■ Generally, appellate courts review the denial of a motion for a mistrial under the abuse of discretion standard, because the "trial judge is in the best position to evaluate whether or not a defendant's right to an impartial jury has been compromised." *Allen v. State*, 89 Md.App. 25, 42–43, 597 A.2d 489, 497 (1991); *State v. Hawkins*, 326 Md. 270, 277, 604 A.2d 489, 493 (1992). "The judge is physically on the scene, able to observe matters not usually reflected in a cold record. The judge is able to ascertain the demeanor of the witnesses and to note the reaction of the jurors...." *Hawkins*, 326 Md. at 278, 604 A.2d at 493.

## Discussion

■ The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, *by an impartial jury* of the State and district wherein the crime shall have been committed...." (Emphasis added.) Article 21 of the Maryland Declaration of Rights also guarantees "[t]hat in all criminal prosecutions, every man hath a right ... to a speedy trial *by an impartial jury*, without whose unanimous consent he ought not to be found guilty." (Emphasis added.) "A criminal defendant's right to have an impartial jury trial is one of the most fundamental rights under both the United States Constitution and the Maryland Declaration of Rights.

---

**3.** The State's answer to Dillard's petition for writ of certiorari phrased the question as follows:

Has Dillard failed to demonstrate prejudice sufficient to warrant a mistrial or trigger a presumption of prejudice analysis based on the fact that two jurors on a lunch break independently walked down a hallway past a detective who had just testified and patted him on the back, commenting, "Good job," where the jurors were not violating the court's instructions, the detective did not respond, Dillard did not ask that the jurors be questioned, and the jury ultimately delivered a not guilty verdict on half the charges before it?

Inherent in both documents are the paramount notions of justice and fair process during criminal proceedings." *Jenkins v. State,* 375 Md. 284, 299, 825 A.2d 1008, 1017 (2003). "The potency of the Sixth Amendment right to a fair trial relies on the promise that a defendant's fate will be determined by an impartial fact finder who depends solely on the evidence and argument introduced in open court." *Wright v. State,* 131 Md.App. 243, 253, 748 A.2d 1050, 1055 (2000) (quoting *Allen v. State,* 89 Md.App. at 42, 597 A.2d 489).

 In the context of a jury trial, "private, intentional communications and/or contacts between jurors and witnesses are generally improper, and convictions in such cases are subject to reversal unless the contacts are proven to be non-prejudicial to the defendant." *Jenkins,* 375 Md. at 301, 825 A.2d at 1018 (citing *Mattox v. United States,* 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892)). Contacts between witnesses and jurors are generally improper because such contacts "raise fundamental concerns on whether the jury would reach their verdict based solely on the evidence presented at trial or whether it would be improperly influenced by inappropriate contacts." *Id.; see also Turner v. Louisiana,* 379 U.S. 466, 472–73, 85 S.Ct. 546, 550, 13 L.Ed.2d 424, 429 (1965) ("In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom" rather than extended extrajudicial contact with a witness.).

 Because communications between jurors and witnesses raise serious concerns about the fundamental fairness of a jury trial, in some cases, private communications between a juror and a third party are "deemed presumptively prejudicial" to the defendant. *Remmer v. United States,* 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654, 656 (1954); *Jenkins,* 375 Md. at 340–41, 825 A.2d at 1041. If the contact is presumptively prejudicial, the burden of proof shifts to the State, which may overcome the presumption by showing that the contact was harmless. *Jenkins,* 375 Md. at 301, 825 A.2d

at 1018. The presumption of prejudice applies to cases where the juror misconduct was "excessive and egregious." *Jenkins,* 375 Md. at 315, 825 A.2d at 1026.

■ In the present case, Dillard argues that the jurors' conduct was both intentional and egregious and, accordingly, a presumption of prejudice should attach to their actions. In Dillard's view, it is of no moment that the trial court failed to instruct the jurors to avoid contact with the witnesses. Dillard points out that such preliminary and interim instructions are not mandatory pursuant to Md. Rule 4–325(a), and asserts that the jurors should have known that intentionally speaking to the State's primary witness was inappropriate. Even if the jurors did not realize their conduct was inappropriate, Dillard asserts that the relevant question is not whether the jurors believed that their actions were appropriate, but rather whether their actions deprived Dillard of his right to a fair trial. The jurors did not approach Detective Smith with mere pleasantries or common-place gestures, according to Dillard. Rather, in Dillard's view, the jurors expressed a view that Detective Smith "had arrested the right man," or, at a minimum, that they had a favorable view of the police investigation. Further, Dillard points out that the jurors felt strongly enough about their view of Dillard's guilt to state it openly, in front of anyone present in the hallway. According to Dillard, the jurors' actions call into question their ability to follow the court's instructions on the presumption of innocence, the weight due to the testimony of law enforcement officers, and the State's burden of proof. Without a *voir dire* examination of the jurors, there is no way to know whether the jurors were able to follow the court's instructions.

The State, in response, argues that the content of the jurors' contact with Detective Smith fails to demonstrate prejudice intrinsically and, accordingly, Dillard failed to carry his initial burden of showing prejudice. In the State's view, this Court's decision in *Jenkins,* 375 Md. 284, 825 A.2d 1008, stands for the idea that presumption of prejudice only arises in cases where there is egregious juror and witness miscon-

duct. In this case, because the jurors had not violated any instructions from the court, the jurors did not engage in any misconduct according to the State. The State asserts that the contact in this case was "fleeting," and that there was no evidence that the jurors sought out Detective Smith, or that they acted in concert. Additionally, the State acknowledges that Detective Smith did not engage in any misconduct, and rather behaved commendably under the circumstances. Because Detective Smith did not engage the jurors, as the State points out, there is no danger, the State's argument continues, that Smith subconsciously swayed the jurors' view of his credibility through polite banter. Further, according to the State, the trial judge's instructions on the presumption of innocence and the State's burden of proof were sufficient to ensure that Dillard received a fair trial. The jury's decision to acquit Dillard of half of the charges confirms that the jury heeded the trial judge's instructions, in the State's view.

Even if we accept the State's argument that *Jenkins,* 375 Md. at 340–41, 825 A.2d at 1041, limits the scope of presumptive prejudice to situations where the jury misconduct is "excessive or egregious," we cannot determine from the record before us whether the contact between the jurors and Detective Smith was sufficiently egregious to create a presumption of prejudice to Dillard. In our view, the relevant question raised by the contact between the jurors and Detective Smith is not whether the jurors violated the court's instruction, but rather, whether the jurors had formed a fixed opinion as to Dillard's guilt before hearing all of the evidence in the case, or whether the jurors had engaged in premature deliberations about Dillard's guilt or innocence. Without a *voir dire* examination of the jurors to determine the intent or sub-text of their comments and whether they had discussed the issue of Dillard's guilt or innocence, the trial judge did not have sufficient information to determine whether the presumption of prejudice attached to the contact or to rule on Dillard's motion for a mistrial. Thus, the trial judge's failure to clarify the factual scenario raised by the contact between the jurors and Detective Smith constituted an abuse of discretion.

■ Although the contact between the jurors and Detective Smith was brief and thus not excessive, the contact may have been egregious because its content was suspect. The contact was particularly troubling for several reasons. First, Detective Smith was a key witness for the State. Contact between a juror and a key witness is more likely to be prejudicial than contact between a juror and an uninterested party. *See Jenkins*, 375 Md. at 306, 825 A.2d at 1031. Second, the jurors specifically sought out the witness to make a comment about his testimony, as opposed to "mere casual contact," like saying "hello" or exchanging passing pleasantries. *Jenkins*, 375 Md. at 322, 825 A.2d at 1030. Further, the contact was not, on its face, an "instinctive human reaction" or a mere passing observation arising out of some detail of the testimony, as asserted by the Court of Special Appeals, but rather was a comment about the content of the witness's testimony that may be related to the question of guilt or innocence. Third, the contact is evidence that the jurors may have formed an opinion as to Dillard's guilt before Dillard presented his case. "If a juror has formed a fixed opinion on a defendant's guilt prior to deliberations, the juror may stand by the opinion even if contradicted by subsequent evidence. A juror may also form premature conclusions without the benefit of final arguments, instructions of law, and jury deliberations." *State v. Rojas*, 177 Ariz. 454, 868 P.2d 1037, 1041 (App.1993). Finally, the fact that two jurors independently made the same comment about Detective Smith's testimony suggested that the jurors may have discussed the case or engaged in premature deliberation about the question of Dillard's guilt or innocence, or Detective Smith's credibility, prior to the completion of testimony. *See United States v. Resko*, 3 F.3d 684, 686 (3d Cir.1993); *Abernathy v. State*, 109 Md.App. 364, 377, 675 A.2d 115, 122 (1996). Because the content of the contact raised these potential factual issues, it was incumbent upon the trial judge to resolve the factual controversy that relates to the jurors' ability to render an impartial verdict.

The present case is distinguishable from the facts of *Abernathy*, 109 Md.App. 364, 675 A.2d 115, on which the Court of

Special Appeals relied in this case. In *Abernathy,* one juror made a comment to another juror about the lifestyle of one of the witnesses, saying "That's what you call a dysfunctional family." *Abernathy,* 109 Md.App. at 377, 675 A.2d at 122. The intermediate appellate court held that the offhand remark was "inconsequential" and thus the trial judge did not abuse his discretion "in not pursuing further this will-o'-the-wisp." *Id.* The intermediate appellate court further observed that "[j]urors are not Sphinxes and, inevitably, they make some comments to each other. . . . It is nothing more than an instinctive human reaction to the events unfolding around one . . . [and] does not constitute deliberation on the merits of the case and is not evidence of bias." *Id.* Unlike in the present case, the comments in *Abernathy* were not between a juror and a third party or witness, but were between two jurors. Further, the content of the comments did not suggest that the jurors had formed any opinions on the ultimate question of Abernathy's guilt or innocence, or even that the jurors had formed an opinion on the witness's credibility. Rather, the comment was merely a passing idle observation about the witness's family life, based on her testimony. The opinion about the family life of a witness had no bearing on the outcome of the case, unlike in the present case, where the jurors' opinions about Detective Smith's testimony could suggest that they had formed an opinion about Dillard's guilt and Detective Smith's credibility.

 Once the parties raise the issue of juror-witness contact, and facts show that the jurors intentionally made contact with a key prosecution witness and that the contact may have been about the substance of his testimony, and that the jurors may have discussed and formed an opinion on the ultimate question of the defendant's guilt or innocence, the trial judge must conduct a meaningful inquiry that will resolve the factual questions raised by the contact. The contact between the jurors and a key witness creates an appearance of impropriety that must be resolved by the court. Unlike in other motions, where if the party does not carry its burden, the trial court is within its discretion to deny the motion, cases

of juror misconduct will undermine the appearance of and the integrity of the judicial process itself. Impropriety and the appearance of impropriety must be avoided because it "casts a shadow over the trial process, which necessarily diminishes the integrity of the system in the minds of defendants and the public itself." *Jenkins*, 375 Md. at 328, 825 A.2d at 1034. Thus, the trial court has an obligation to resolve questions of impropriety or threats to the integrity of the jury trial. *See United States v. Sears*, 663 F.2d 896, 900 (9th Cir.1981) (holding that the District Court did not abuse its discretion when the trial judge "questioned the juror extensively enough to *satisfy itself* that the juror was not biased" (emphasis added));[4] *Commonwealth v. Mosley*, 535 Pa. 549, 637 A.2d 246, 250 (1993) (holding that the court has a duty to resolve the issue of prejudice arising out of jury misconduct, even though the defense could have requested a *voir dire* examination of the juror in its Motion to Disqualify).

In the present case, the trial judge could not resolve the issue of juror misconduct without conducting a *voir dire* examination of the jurors to determine the intent or meaning of their contact with Detective Smith, whether they had reach a fixed opinion as to Dillard's guilt, and whether they had engaged in premature deliberations. Where there is a serious allegation of bias or possible prejudice, "[t]he trial judge [has] an affirmative obligation to inquire whether the juror could nonetheless render a fair and impartial verdict" by conducting a *voir dire* examination of the juror prior to ruling

---

4. As we noted in *Jenkins v. State*, 375 Md. 284, 319, 825 A.2d 1008, 1028 (2003), even if the Sixth Amendment, as interpreted by the Supreme Court of the United States in *Remmer v. United States*, 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654, 656 (1954), and its progeny, does not permit a presumption of prejudice, the Maryland Declaration of Rights "requires such a presumption in limited egregious cases of juror *and* witness misconduct to insure that a criminal defendant receives adequate due process." Accordingly, even if the Sixth Amendment does not permit a presumption of prejudice, the trial judge must conduct a meaningful inquiry to resolve issues of prejudice arising out of juror misconduct to protect the defendant's fundamental right to an impartial jury trial pursuant to Article 21 of the Maryland Declaration of Rights.

on the motion. *Wilson v. Morris*, 317 Md. 284, 304, 563 A.2d 392, 401 (1989) (holding that the *voir dire* examination was "imperative in determining whether 'good cause' existed sufficient to support the allegation of juror bias"). Determining whether there is prejudice is the goal of *voir dire. See Grandison v. State*, 305 Md. 685, 726, 506 A.2d 580, 600 (1986) (noting that even if contact raises the presumption of prejudice, the jurors may be "rehabilitated through additional questioning"); *Summers v. State*, 152 Md.App. 362, 376, 831 A.2d 1134, 1141 (2003) ("When the trial judge is able to *voir dire* a juror about the improper contact and assess how it may affect the juror's prospective ability to deliberate or to render a fair verdict, the presumption of prejudice may not be warranted."). "Where a colorable claim of jury taint surfaces before jury deliberations occur, ... [t]he judge should investigate the allegation promptly, addressing whether the taint-producing event occurred, and if so, assessing the magnitude and extent of any prejudice caused." *United States v. Tejeda*, 481 F.3d 44, 52 (1st Cir.2007). Further, the trial court should exercise its "power to assure itself that the ... jurors could continue fair and impartial deliberations." *Jenkins*, 375 Md. at 308, 825 A.2d at 1022.

An examination of the case law on issues of juror misconduct demonstrates that the court has a duty to fully investigate allegations of juror misconduct before ruling on a motion for a mistrial, and that failure to conduct a *voir dire* examination of the jurors before resolving the issue of prejudice is an abuse of the trial judge's discretion. Generally, in cases where the trial judge or the parties conducted a *voir dire* examination of the juror or jurors in question, the appellate courts have upheld the trial court's decision on the issue of prejudice to the defendant. *E.g., Grandison*, 305 Md. at 726–27, 506 A.2d at 618–19; *Eades v. State*, 75 Md.App. 411, 423–24, 541 A.2d 1001, 1008 (1988); *Summers*, 152 Md.App. at 377, 831 A.2d at 1142; *Ezenwa v. State*, 82 Md.App. 489, 518, 572 A.2d 1101, 1114–15 (1990); *Allen*, 89 Md.App. at 47–48, 597 A.2d at 500; *Tejeda*, 481 F.3d at 52; *United States v. Peterson*, 385 F.3d 127 (2d Cir.2004); *United States v. Ramos*, 71

F.3d 1150 (5th Cir.1995); *Sears,* 663 F.2d at 899–900; *United States v. Puckett,* 692 F.2d 663, 669–70 (10th Cir.1982); *see also Smith v. Phillips,* 455 U.S. 209, 217, 102 S.Ct. 940, 946, 71 L.Ed.2d 78, 86 (1982) (noting that *voir dire* and protective instructions are "the safeguards of juror impartiality" when a juror is placed in a "potentially compromising situation"); *but see Wright,* 131 Md.App. at 271, 748 A.2d at 1065 (overruling the trial judge's determination about prejudice, despite a *voir dire* of the jurors, because "[a]lthough the jurors may have honestly thought that they could disregard the information in the articles, in our judgment, any doubts the jurors may have had, reasonable or otherwise, would have been resolved against appellant,—even if only subconsciously—as a result of the information contained in the articles").

Conversely, in cases where the trial court did not conduct a *voir dire* examination of the juror or jurors involved in an incident, appellate courts often held that the trial court abused its discretion because the trial judge lacked sufficient information to determine whether the incident was prejudicial. *E.g., Remmer,* 347 U.S. at 229, 74 S.Ct. at 451, 98 L.Ed. at 656 ("We do not know from this record, nor does the petitioner know, what actually transpired, or whether the incidents that may have occurred were harmful or harmless."); *Resko,* 3 F.3d at 686 (holding that the District Court abused its discretion in "refusing to conduct a more searching inquiry" into juror misconduct and noting that "[o]rdinarily, a defendant must show that the error was prejudicial in order to obtain a new trial. [In the present case, however], we fail to see how the district court could have made a reasoned determination that the defendants would suffer no prejudice due to the jurors' premature discussions" without further information about the content of the discussions); *Richardson v. United States,* 360 F.2d 366, 369 (5th Cir.1966) ("In failing to conduct 'a thorough inquiry ... to determine exactly what ... occurred' before overruling the motion, the trial court abused its discretion." (citation omitted)); *United States v. Vasquez–Ruiz,* 502 F.3d 700 (7th Cir.2007); *Rojas,* 868 P.2d at 1041–42; *Mosley,* 637 A.2d at 250 ("Without the juror's testimony, the

trial judge was not in a position to determine that the encounter between Sergeant Wilson and the juror amounted to harmless error."); *State v. Pike*, 712 P.2d 277, 280–81 (Utah 1985) (noting that the court presumed prejudice when no *voir dire* examination of the juror, witness examined); *see also Castro v. State*, 186 Ga.App. 248, 367 S.E.2d 42, 43 (1988) ("[A]s the juror was not called to explain the incident . . . the prosecution failed to carry its burden showing the absence of harm beyond a reasonable doubt.").

The cases in which an appellate court upheld a trial judge's determination about the prejudicial effect of juror misconduct without a *voir dire* examination of the juror or jurors in question are distinguishable from the facts of the present case. For example, in *Bruce v. State*, 351 Md. 387, 396, 718 A.2d 1125, 1129 (1998), an electronic bulletin board in the courthouse displayed information about another case involving the defendant, which if seen by the jurors, may have provided prejudicial information. We held that the trial judge did not abuse his discretion when he determined that "there was no reasonable likelihood that any of the jurors had seen the potentially prejudicial information . . . [on] the electronic bulletin board." *Id.* Unlike in the present case, in *Bruce*, there was no allegation that the jurors actually received prejudicial information, only that it was possible. The facts uncovered by the trial judge in *Bruce* also showed that it was unlikely that the jurors would have seen the bulletin board, because they were instructed to use another entrance to the courthouse.

Similarly, in *United States v. O'Brien*, 972 F.2d 12, 14–15 (1992), the United States Court of Appeals for the First Circuit held that the trial judge did not abuse his discretion in relying on a *voir dire* examination of a witness to make a determination about prejudice. In *O'Brien*, the *voir dire* of the potential witness revealed that the jurors did not know he was involved in the case when they had contact with him, and that the contact was brief and was not about the content of the case. *Id.* Unlike in *O'Brien*, in the present case, the jurors clearly knew that Detective Smith was a key witness in the case, because they had just listened to his testimony. Fur-

ther, the jurors' contact with Detective Smith was related to the content of his testimony. Thus, unlike in *O'Brien,* the trial judge could not rely solely on Detective Smith's perceptions about the conversation, but rather needed critical information about the jurors' intent and how they perceived the conversation. Additionally, in *O'Brien,* unlike in the present case, the defendant specifically objected to a *voir dire* examination of the jurors. *O'Brien,* 972 F.2d at 14.

In *State v. Overton,* 279 Kan. 547, 112 P.3d 244, 252–53 (2005), the Supreme Court of Kansas held that the trial judge did not abuse his discretion in determining that there was no prejudice to the defendant when jurors overheard a spectator comment that the defendant "will get his judgment when the day comes." Although the trial judge did not conduct a *voir dire* examination of the jurors about the incident, the judge personally heard the same comment and was able to evaluate its prejudicial effect based on his direct experience. *Id.* The trial judge in the present case did not have the benefit of firsthand knowledge about the contact between the jurors and Detective Smith. Additionally, in *Overton,* unlike in the present case, the person making the comment was an unknown spectator, not a witness in the case. *Id.*

The present case is analogous to the facts of *Mosley,* 637 A.2d 246. In *Mosley,* a juror had a conversation with a key law enforcement witness during the course of the trial. *Mosley,* 637 A.2d at 247. Mosley asked that the juror be excused for cause and replaced with an alternate. *Id.* The trial judge conducted a *voir dire* examination of the law enforcement witness, who testified that the conversation "was loud enough for all to hear, lasted less than a minute and did not relate in any way to the case" or to the witness's law enforcement duties, or anything else related to the criminal justice system. *Mosley,* 637 A.2d at 248. The trial judge found that the conversation did not raise an issue of prejudice and was at worst "harmless error." *Id.* The Supreme Court of Pennsylvania, after noting that this contact was not incidental, and that the law enforcement officer was a key witness whose credibility had a strong bearing on the case, held that the trial

judge abused his discretion in failing to question the juror "about any possible taint which may have resulted from his conversation" with the witness. *Mosley,* 637 A.2d at 250.

Further, the Supreme Court of Pennsylvania held that it was error for the trial judge to rely solely on defense counsel to call witnesses in support of counsel's Motion to Disqualify the juror. *Id.* The Supreme Court noted that "[t]his placed defense counsel in the difficult position of deciding whether to avoid questioning the juror or run the risk of antagonizing a juror who might remain to decide his client's fate." *Id.* The Supreme Court determined that it was not acceptable to leave the juror unexamined, even if this were a strategic decision on the part of defense counsel because "[w]ithout the juror's testimony, the trial judge was not in a position to determine that the encounter between [the witness] and the juror amounted to harmless error." *Id.* The Supreme Court of Pennsylvania's holding suggests, as we have explicitly stated in the present case, that it is the duty of the court to fully investigate and resolve an issue of juror-witness contact that may be prejudicial to the defendant.

 We agree with the State that the trial judge may rehabilitate juror misconduct through a curative instruction in some cases. While it is undoubtedly true that courts should generally consider curative instructions to correct possible prejudice, *see Rainville v. State,* 328 Md. 398, 410–11, 614 A.2d 949, 955 (1992), the court cannot evaluate the propriety and effect of a curative instruction unless it fully inquires about or knows the extent of the prejudice to the defendant. Jurors generally are presumed to follow the court's instructions, including curative instructions, *Ezenwa,* 82 Md.App. at 518, 572 A.2d at 1115, however, in the present case, it is unknown whether the contact with the witness demonstrated a prejudice that would render the jurors unable to follow the court's instructions. *See State v. Cook,* 338 Md. 598, 616–17, 659 A.2d 1313, 1323 (1995) (noting that the judge, upon conducting a *voir dire* examination of the witness, may determine that the juror is unable to follow the court's instructions). A *voir dire*

examination of the juror, combined with a curative instruction, may have resolved the issue in the present case, but a curative instruction without full knowledge of the extent of the prejudice to the defendant could not.

For the foregoing reasons, we shall reverse the judgment of the Court of Special Appeals and remand the case for a new trial. The appropriate remedy for the improper denial of a motion for a mistrial is a new trial. *Stewart v. State*, 334 Md. 213, 230, 638 A.2d 754, 762 (1994).

**JUDGMENT OF THE COURT OF SPECIAL APPEALS IS REVERSED; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO VACATE THE JUDGMENT OF THE CIRCUIT COURT FOR CHARLES COUNTY AND TO REMAND THE CASE TO THAT COURT FOR A NEW TRIAL CONSISTENT WITH THIS OPINION. CHARLES COUNTY TO PAY THE COSTS.**

ADKINS, J., Dissents.

ADKINS, J., dissenting.

I respectfully dissent. I see no abuse of discretion by the trial court in denying Petitioner's request for a mistrial. I would affirm the judgment of the Court of Special Appeals, which, in turn, affirmed the Circuit Court for Charles County because the casual and isolated communication by two jurors commending a witness's testimony could not have prejudiced Petitioner.

As the majority seems to acknowledge, under *Jenkins,* juror misconduct must be "**excessive or egregious**" before prejudice to the defendant may be presumed. *See Jenkins v. State,* 375 Md. 284, 315, 825 A.2d 1008, 1026 (2003). Indeed, "not all incidental contacts between jurors and witnesses are inherently prejudicial." *Id.* at 321, 825 A.2d at 1030. The majority reverses, not because the juror misconduct was excessive or egregious, but on the grounds that the trial court failed to conduct a voir dire examination of the jurors "to determine the intent of their comments and whether they had discussed the issue of Dillard's guilt or innocence[.]" Majority Op. at

457, 3 A.3d at 410. While the majority may not presume prejudice, it certainly requires that the court conduct a voir dire of the jury when even the most incidental contact between a juror and a witness transpires. In my view, this is an improper resolution of the case, for several reasons.

First, Petitioner never asked the trial court to conduct a voir dire of the jurors. Examination of the transcript below reveals that when the police officers could not describe or identify the jurors without the jurors present, defense counsel asked "that the jurors be brought in, observed, and then taken away so that the officers then can—tell the court." The court complied with this request, bringing the jurors in, and had them identify themselves by their juror numbers. With that information, Detective Smith was able to identify Jurors 194 and 177 as the ones who complimented his testimony. The trial court *twice* asked whether counsel had any further requests of the court. Defense counsel responded the second time by asking to question Detective Smith about which juror spoke to him first. Smith responded, "[t]he elderly gentleman said it to me first. The other juror wasn't in view when he said it. The other juror was around the corner. It was in passing. Everybody was walking by." Neither counsel asked for voir dire of the jurors. Rather, after she questioned the detectives, Petitioner's counsel simply repeated her request for a mistrial, and alternatively, to "unseat [juror 194] and replace [him] with an alternate."

Under these circumstances, there was no reason for the trial judge to administer a voir dire of the two jurors before ruling on the mistrial, and we should not reverse the court's exercise of its discretion for failing to do something it was not asked to do. As the Court of Special Appeals said in the case below:

Considerations of fairness and judicial efficiency generally require that all challenges that a party wishes to make to a trial court's ruling, action, or conduct "be presented in the first instance to the trial court so that (1) a proper record can be made with respect to the challenge, and (2) the other parties and the trial judge are given an opportunity to

consider and respond to the challenge." *Chaney v. State,* 397 Md. 460, 468 [918 A.2d 506] (2007).... On this basis, appellant's complaint as to the court's failure to take curative action is unavailing.

*Dillard v. State,* No. 1578, slip op. at 18 (Md.Ct.Spec.App. Feb. 11, 2009). Although there may be some instances in which a trial court must initiate the voir dire of the jury on its own, 2 without request from counsel, in my view, this isolated and innocuous occurrence does not justify such a ruling. The reasons for my conclusion will be evident from my discussion of the Circuit Court's denial of the motion for mistrial, which follows.

In my view, the trial court did not commit error by its refusal to grant a mistrial, which was the remedy requested by Dillard. To explain my view of this issue, I quote liberally from the Court of Special Appeals's opinion. It said:

> [T]he conduct of a criminal trial is committed to the sound discretion of the trial court, and the exercise of that discretion will not be disturbed on appeal absent a clear showing of abuse. We will not disturb the trial court's ruling on a motion for mistrial absent an abuse of discretion.
>
> Whether a mistrial is warranted hinges upon the question of prejudice to the defendant.... A mistrial is ... an extreme sanction that sometimes must be resorted to when such overwhelming prejudice has occurred that no other remedy will suffice to cure the prejudice. Noting that the purpose of a mistrial is remedial, not "prophylactic," ... the *Burks* Court added: "[T]he decision as to whether a mistrial is called for is contingent upon the impact of an error and not upon the motivation behind the error."

*Dillard,* slip op. at 18–19 (quotation marks and citations omitted). Applying the appropriate standard of review of the trial court's exercise of discretion, the intermediate appellate court concluded:

> Notably, jurors 177 and 194 did not engage in any "misconduct," because they did not violate the court's instructions by talking to Smith. Moreover, their conduct did not

demonstrate that they had decided Dillard's guilt before hearing all the evidence and prior to deliberations. In the context of this case, we agree with the State, which posits: "Where an individual juror's conduct at trial is neither nefarious nor prejudicial, a trial court's discretionary decision not to question the juror or declare a mistrial will be upheld."

*Dillard*, slip op. at 20. I agree with the Court of Special Appeals that jurors 177 and 194 engaged in no "misconduct." They were not instructed that they could not say anything to the witnesses. Significantly, they did not go out of their way to contact this witness—the jurors were walking by the witness in the course of going to lunch, and made the brief complimentary comment and gesture about his testimony.[1]

Unquestionably, the witness did not communicate with the jurors in any way outside his testimony. So, there is no possibility that the jurors were influenced by some ex parte contact, or that their verdict was tainted by some inappropriate outside information or opinion. This fact isolates the instant case from *Jenkins* and the other cases cited by the majority.

The majority's decision to reverse and order a new trial, then, must rest on the shaky premise that jurors must not evaluate testimony as they hear it, and if they do so, their verdict is tainted and must be vacated. Indeed, the majority, citing an Arizona case, concludes that a trial court must grant a mistrial if it determines the jurors had "engaged in premature deliberation about the question of Dillard's guilt or innocence, or Detective Smith's credibility, prior to the completion of testimony." Majority Op. at 458, 3 A.3d at 410. I respectfully disagree, and submit that we would be naive to suppose that jurors suspend all judgment about the witnesses

---

1. The prosecutor reported the incident to the court, saying that the police officers reported to her that "when we broke for lunch that—two jurors walked by—as the jurors were walking by two of them—patted—Detective Smith on the back and said, 'Good job[.]' In response Detective Smith did nothing. . . . He kept walking his direction, they're walking opposite directions."

and other evidence presented to them until the time of formal deliberations. Studies of juries and their decision-making processes bear this out.

Numerous studies of juror cognition and behavior indicate that jurors are continually evaluating the information that they receive during a trial, beginning with opening arguments and proceeding up to and through jury deliberations. *See* Robert K. Bothwell, *Social Cognition in the Courtroom: Juror Information Processing and Story Construction, in* A HANDBOOK OF JURY RESEARCH 17–1 through –18 (Walter F. Abbott & John Batt eds., 1999). Indeed, some research suggests that the presentation of the opening argument itself makes a substantial impact on how jurors view the remainder of a trial. *Id.* at 17–8 through –10; *see also* Jansen Voss, *The Science of Persuasion: An Exploration of Advocacy and the Science Behind the Art of Persuasion in the Courtroom,* 29 LAW & PSYCHOL. REV. 301, 311–12 (2005) (Opinions formed as a result of the first argument presented at trial "have been found to bias the interpretation of subsequent evidence.").

The leading theory on juror decision-making states that jurors "impose a narrative story organization on trial information." Nancy Pennington & Reid Hastie, *A Cognitive Theory of Juror Decision Making: The Story Model,* 13 CARDOZO L.REV. 519, 521 (2006) (discussing the "Story Model" of juror decision-making). The process of constructing such a narrative engages jurors in an "active, constructive, comprehension process in which **evidence is organized, elaborated, and interpreted by them during the course of the trial.**" *Id.* at 523 (emphasis added).

Indeed, studies suggest that jurors change their positions during the course of a trial as new evidence is presented to them. *See* Shari Seidman Diamond, *Beyond Fantasy and Nightmare: A Portrait of the Jury,* 54 BUFFALO L.REV. 717, 743–46 (2006) (discussing studies in which mock jurors provided differing "interim verdicts" during the course of trial proceedings). One psychologist has stated that the process of

[A]ccount[ing] for the facts by inferring causal and intentional links among particular facts ... begins *during* the trial. Clearly, the law's assumptions and injunctions—that jurors suspend judgment, hear all the evidence, and then weigh the evidence and decide—is at odds with what jurors actually do.... The law's fictional assumption is akin to a stricture ordering readers of detective fiction not to think about whodunnit until they reach the last chapter. It cannot be done, except, perhaps, by the most incurious of minds, or by a mind so compartmentalized that a psychiatric diagnosis is in order.

Norman J. Finkel, *Commonsense Justice: Jurors' Notions of the Law* 74–75, 350 n. 69 (1995) (emphasis in original).

Although in a theoretical model of a perfect trial, jurors might suspend all judgment until the introduction of all evidence and closing arguments are heard, we cannot ignore the reality that jurors are undertaking a continual evaluation of the information they receive during trial. I see no reason and no benefit in deciding cases based on the fanciful notion that the real people who sit on juries conform to a purist model of what we (and our predecessors) deem to be ideal for fair adjudication.

The trial court wisely recognized the futility of attempting to enforce this fictional model of juror conduct, commenting,

It is customary when we send jurors out of the room to go to lunch or go home or something, to say look don't discuss the case among yourself—selves—don't allow other people to discuss it with you. I know ... they seldom abide by the first part, but my sense is that for the most part they abide by the second part, allowing other people to discuss it with them.

The trial judge is the one who has experience dealing with juries, and based on that experience, he made an assessment—that the jurors in question acted within the range of usual juror conduct. They evaluated the case as they went along, and maybe made a comment to each other about

whether a witness was credible or effective. The trial court believed this was not juror misconduct, and not a big deal:

It occurs to me though that it [is] really a situation where we happen to have at this juncture a little more information about something you know—going on in the mind of two jurors than we otherwise would have. I can't imagine for a moment that commentary—about a witness performance— positive or negative—doesn't get uttered behind that door— with some regularity before the jury retires to deliberate. I would think when they take a [bathroom] break that . . . it would be . . . contrary to human experience for remarks like that not to be made occasionally, or remarks not to be made . . . I don't find from this that it's necessary to conclude that the . . . juror was doing . . . anything other than saying nice police work. And it doesn't necessarily amount to any kind of commentary on the relationship of that police work to this defendant.

The assessment of this conduct was the trial judge's call, not ours to make. The judge obviously gave serious consideration as to whether any misconduct had occurred or any harm had been done, and decided no, in both respects.

As I mentioned before, this case bears little resemblance to *Jenkins v. State,* the case relied on heavily by Petitioner. The Court of Special Appeals explained the facts of *Jenkins:*

In *Jenkins,* a detective who had testified at a murder trial informed the prosecutor, five days after the verdict, that she had contact with a juror during the course of the trial. The defendant moved for a new trial, alleging "an improper contact between a juror and a detective witness for . . . the State," which "caus[ed] prejudice to [Jenkins] and pre- clud[ed] his right to a fair trial." At a motion hearing, the detective and the juror testified about what the Court characterized as "the extensive contact they had" during a weekend religious retreat, held while the trial was in prog- ress. The juror testified that he recognized the detective and tried to avoid her, but then approached the detective and told her he could not talk to her. The juror thought the

detective was under the impression that the juror had served on a completed case, because the detective asked if the jury had found the defendant guilty. The juror advised that the case was still in progress. According to the juror, the two did not discuss the case further, but they sat together at a seminar; had lunch together; and the detective drove the juror to his car at the end of the retreat. The detective provided similar testimony.

*Dillard,* slip op. at 21 (citations omitted).

The Court of Special Appeals went on to explain that the burden initially falls on the defense to show the impropriety, and shifts to the State with regard to "*some* such juror contacts with third parties and/or misconduct." *Jenkins,* 375 Md. at 301, 825 A.2d at 1018 (emphasis added). Interpreting our decision in *Jenkins* it also explained:

[The Court of Appeals] clarified that instances of presumptively prejudicial contact arise when there is excessive or egregious jury misconduct or improper contact by a third party occurs. The Court added that prejudice is presumed where "*egregious* juror *and* witness *misconduct* occurs," such as when both the juror and the witness ignore the court's orders and choose to interact, including "when a witness and a juror go to lunch together during the middle of a trial when both have been admonished, in one way or another, to avoid each other." Further, the Court explained that when the record is silent with respect to whether intentional and inappropriate juror contact was prejudicial, prejudice may be presumed if the nature of such contact "raise[s] fundamental concerns on whether the jury would reach [its] verdict based solely upon the evidence presented at trial or whether it would be improperly influenced by the inappropriate contacts." In these circumstances, the burden falls on the State to rebut the presumption of improper influence.

\* \* \*

The *Jenkins* Court concluded that prejudice would be presumed based on the egregious circumstances presented in

that case—a juror lunching with a police detective who had recently testified in a murder trial, while that case was still being tried to that juror. Similarly, prejudice has been presumed in other egregious circumstances. *See Turner v. Louisiana*, 379 U.S. 466, 471–74 [85 S.Ct. 546, 13 L.Ed.2d 424] (1965) (concluding that extensive daily contact between a sequestered jury and two deputy sheriffs who testified at trial was presumptively prejudicial)....

*Dillard*, slip op. at 22–23 (citations omitted).

The Court of Special Appeals went on to conclude that the presumption of prejudice that we applied in *Jenkins* was not applicable here:

[T]he contact here was minimal, consisting of a few complimentary words ("good job"); uttered by two jurors independently, and a common-place gesture of a pat. Clearly, there was no "prolonged contact," *id.* at 289 [825 A.2d 1008], between the jurors and Smith. Nor was there misconduct by "juror *and* witness." *Id.* at 319 [825 A.2d 1008] (emphasis in original). In this regard, it is noteworthy that the jurors did not violate any cautionary instructions from the court, as none were given. Nor did Smith, the witness, respond to the comments.

Moreover, the compliment, "good job," and the accompanying pat on Detective Smith's back, could have referred to the investigation or to the detective's testimony. Of import, neither the comment nor the gesture said anything about the jurors' view[s] as to Dillard's culpability. Indeed, the jurors' actions were so minimal that they could not be said to establish a lack of impartiality or demonstrate that the jurors had already reached guilty verdicts.

*Dillard*, slip op. at 26. I agree with the Court of Special Appeals that neither *Jenkins* nor any other case cited by Dillard supports the conclusion that prejudice should be presumed, or that the conduct of the jurors mandated a mistrial, or even that the trial court was required to question the jurors.

The majority opinion, as I read it, does not exactly presume prejudice, but it comes close. It holds that the trial court missed the opportunity to verify, by questioning the jurors, that the incident would have no influence on the jurors' decisions, and that this was an abuse of discretion, notwithstanding the defendant's failure to request that the trial court do so. I respectfully dissent because I cannot see how this incident could possibly influence the jurors in their thinking about the case. The jurors heard the testimony, and made a contemporaneous evaluation. As the trial court indicated, this brief communication by the two jurors was simply giving the court and counsel "a little more information about something . . . going on in the mind of two jurors than we otherwise would have."

For these reasons, I would affirm.