REPORTED

IN THE COURT OF SPECIAL APPEALS

No. 1916

September Term, 2013

_____

KARLA LOUISE PORTER

v.

STATE OF MARYLAND

_____

Graeff,
Kehoe,
Friedman,

JJ.

_____

Opinion by Kehoe, J.
Dissenting Opinion by Friedman, J.

_____

Filed: October 25, 2016

After a six day jury trial in the Circuit Court for Baltimore County, Karla Louise Porter was convicted of first degree murder and related crimes. On appeal, she presents three issues, which we have reworded:

> 1. Was the trial court's jury instruction on imperfect self-defense erroneous as a matter of law?
>
> 2. Did the court err when it declined to voir dire the jury after receiving a jury note suggesting that the jurors were speculating about matters not presented at trial?
>
> 3. Did the court err in denying Ms. Porter's motion to suppress the inculpatory statement she made to the police?

The State concedes that the trial court's instruction on imperfect self-defense was flawed. The State argues that the error was harmless because Ms. Porter was not entitled to the instruction in the first place. We believe that the State is correct. The trial court did not abuse its discretion when it declined to question the jurors individually about the contents of the note, nor did the court err when it denied Ms. Porter's motion to suppress her statement. We will affirm the convictions.

## Background

Because Ms. Porter does not challenge the legal sufficiency of the State's case against her, our summary of the facts will focus on the evidence relevant to her contentions on appeal.

### The Principals

During the early morning hours of March 1, 2010, *William Raymond Porter* was shot to death as he opened the Hess Gas Station that he owned and operated with his wife, Ms. Porter, in Baltimore County. *Walter Bishop* was the shooter. Bishop was a friend of

1

*Seamus Coyle*, Ms. Porter's nephew. Coyle first introduced Bishop to Ms. Porter. *Susan Datta*, Ms. Porter's sister, *Calvin Mowers*, her brother, and *Matthew Brown* were also involved in the conspiracy to kill Mr. Porter.[1] Bishop, Mowers, Coyle, Datta, and Brown were all prosecuted for their involvement in Mr. Porter's murder.

*Evidence of Abusive Relationships*

Ms. Porter testified at trial. She stated that her parents were separated when she was about six or seven years old and that, for several years thereafter, she lived with her mother and her mother's boyfriend. The boyfriend regularly physically and verbally abused her mother in Ms. Porter's presence and once pushed Ms. Porter into a hot stove, causing severe burns. Her mother did nothing about the incident and Ms. Porter went to live with her father when she was nine years old.

Ms. Porter testified that she met Mr. Porter in 1982 and that they married in 1986. Ms. Porter described controlling behavior on Mr. Porter's part from the outset of their relationship. She testified at length about numerous instances of physical, verbal, and psychological abuse, beginning early in their marriage and escalating, in severity and frequency, in the late 1990's and thereafter. For example, and this list is not all-inclusive, Ms. Porter testified that, during their marriage, her husband had: beaten her on her back and legs with a belt; on various occasions hit her with a rake, a board, his fists, and a tool box; stabbed her in the abdomen with a drill; pushed her head into a grave marker; smeared dog excrement on her; and threatened to kill her on several occasions, at least

---

[1] Brown's precise role in the conspiracy is not altogether clear from the record.

once while pointing a gun at her. Additionally, she testified that he repeatedly had made demeaning and derogatory statements to her about her appearance and her worth as a human being, and that he had harassed her at work, and forced her to stand at their kitchen sink and drink water until she urinated on herself.

Not all of this testimony was uncontested. Ms. Porter identified eyewitnesses to several incidents of abuse who were called by the State in rebuttal and testified that the incidents had never occurred in their presence. Moreover, her testimony as to Mr. Porter's abuse differed in some significant ways from what she had told her mental health professionals prior to trial.[2] However, some of Ms. Porter's testimony was corroborated by the Porters' youngest child, Megan Porter. Megan testified that the environment in the family home was tense, and that Mr. Porter was regularly angry. She testified that her mother was submissive to her father's anger, and that Ms. Porter was frequently the target of Mr. Porter's frustrations. It was Megan's testimony that her father regularly yelled at her mother and called her demeaning and degrading names. Megan testified that, although she never saw her father strike her mother, she had seen her mother with bruises on her arms and legs, and at one point with a black eye.[3]

---

[2] For example, Mary Ann Dutton, Ph.D., a psychologist testified on cross-examination that Ms. Porter had not told her about the dog excrement incident.

[3] Additionally, Raymond Naimaster, a long-time friend of Ms. Porter's, testified that the interaction between Mr. Porter and Ms. Porter led him to suspect that she was being abused but that, when he asked her about it, "she kind of dropped her head . . . and got small." The Reverend Johnny Brewer, a pastor at Ms. Porter's church, testified that she had hinted to him that she was being verbally abused in the mid-1990's. Lorraine Briggs, who had worked at the Hess Station for fourteen years prior to Mr. Porter's death, testified that Mr. Porter often criticized Ms. Porter for her appearance. The testimony of

Ms. Porter testified to two instances of abuse in the "week or so" before Mr. Porter's death. The first arose out of Mr. Porter's desire to move to Florida—a source of tension in the parties' marriage, particularly in the year before Mr. Porter's death. Mr. Porter held a gun to Ms. Porter's head, and informed her that they would not be taking their children[4] or his parents to Florida, when they moved. And then turned his attention to her, stating: "Maybe I am not even going to take you. I should just kill you now." In the second instance, Mr. Porter struck Ms. Porter across her back with a crutch because he did not find her degree of sympathy towards the fact that he was "bored" to be satisfactory. Ms. Porter testified that from June 2009 through March 1, 2010, she was "terrified almost on a daily basis." She testified that during the period of late 2009 through March 2010:

> I was in fear for my life. I knew it was getting to the point where Ray was getting out of control. I knew it was a matter of time before he killed me.
>
> . . .
>
> [T]hings were getting so bad, things were just out of control. I know it was crazy. It was just a day-to-day—it wasn't even day-to-day. It was minute-to-minute. Always walking on eggshells. I never could do anything on my own. Something as simple as taking a shower.
>
> . . .
>
> It was getting so bad that I knew that Ray was going to kill me and I just wanted to kill him first.

---

Susan Datta was read into the record. Ms. Datta testified that her sister had spoken to her about abuse and being fearful of her husband.

[4] The Porters' youngest child was 18 years old at the time Mr. Porter was murdered.

*Ms. Porter's Earlier Attempts to Solicit Someone to Kill Mr. Porter*

In June 2009, that is, about nine months before Mr. Porter was murdered, Ms. Porter approached Daniel Blackwell, her daughter's boyfriend at the time, about killing Mr. Porter. Although they differed as to some of the specifics, both Ms. Porter and Blackwell testified that she offered him money to kill Mr. Porter, that he, at least initially, expressed an interest in doing so, but that he never followed through.[5]

Ms. Porter approached a second person—Tony Fails—in December 2009. Fails was a business associate of Mr. Porter's. He testified that he had no intention of participating in the crime, but did not refuse Ms. Porter's request. Instead, he told Ms. Porter that he would make some calls and get back to her. Ms. Porter called Mr. Fails throughout January 2010—by her own testimony, she called Mr. Fails frequently, sometimes several times a day—to see if he had found someone who was willing to kill Mr. Porter. Mr. Fails never made any phone calls on Ms. Porter's behalf. Ms. Porter stopped calling Fails towards the end of January 2010.

In the same month, Ms. Porter contacted Paige Huemann, who had lived with the Porters in 2007, about obtaining potassium cyanide so that she could poison Mr. Porter. Ms. Porter testified that Ms. Huemann did not provide her with any information as to

---

[5] Ms. Porter testified that she gave Blackwell $1,000, and that he never returned the money. Blackwell testified that he was, at one point, presented with an envelope containing $3,000 and promised an additional $7,000, upon completion of the murder but that he refused to accept the money.

obtaining poison.[6]

*Ms. Porter Recruits Bishop*

Ms. Porter testified that one of her nephews, Seamus Coyle,[7] introduced her to Bishop during a meeting between herself and Coyle in a Walmart parking lot, in late January or early February 2010. Coyle had arranged to meet Ms. Porter because she had agreed to give Coyle money to make his mortgage payment. Bishop was seated in the passenger seat of the vehicle that Coyle was driving, and volunteered to kill Mr. Porter after listening to Ms. Porter describe Mr. Porter's abuse of her. Coyle testified that at that point Bishop exited the vehicle, walked toward the rear, and had a conversation with Ms. Porter. Coyle remained in the vehicle, but overheard something about $500, and it was his belief that telephone numbers were exchanged.

At a subsequent meeting in February 2010, Ms. Porter and Bishop finalized their agreement that Bishop would kill Mr. Porter and Ms. Porter gave Bishop the handgun that he would use to commit the murder. The handgun had been given to Ms. Porter by Susan Datta, her sister.

*The Murder and the Police Investigation*

On the evening of February 28, 2010, the night before Mr. Porter was murdered, Ms. Porter and Bishop spoke by telephone and agreed that Bishop would arrive at the gas

---

[6] Baltimore County Police Detective Sekou Hinton testified that Ms. Porter also contacted a Travon Duncan about killing her husband but did not provide further details. Duncan did not testify and Ms. Porter did not mention Duncan in her own testimony.

[7] Coyle did not testify at Ms. Porter's trial. Rather, excerpts of the transcript of Coyle's testimony from his own trial were read into the record.

6

station in the early morning hours of March 1, 2010, and that he would shoot Mr. Porter before anybody else would be around. At around 2:30 a.m. on March 1, Ms. Porter, using her cell phone, called her home telephone and told her husband that the alarm company had called and told her that the security alarm had gone off at the gas station. Mr. Porter then prepared himself for the day and proceeded to the gas station. (Mr. Porter usually arrived at the gas station between 4:00 and 4:15 in the morning.)

After Mr. Porter left the house, Ms. Porter called her brother, Calvin Mowers, and arranged to have him drive Bishop to the gas station. Ms. Porter placed more than 50 calls from her cell phone to Bishop and Mowers between 2:30 am and 7:00 am on March 1, 2010. After leaving her home, Ms. Porter met Bishop, Mowers, and Matthew Brown at a McDonald's, where she confirmed that Bishop would follow through with the murder.

Ms. Porter then went to the Hess station. When she arrived, Mr. Porter was talking to a friend and she began taking inventory and performing other routine opening activities. At one point, Ms. Porter left the building, and when she re-entered Bishop followed her through the side door. Upon entering the station, Bishop ordered Ms. Porter and Mr. Porter to move toward the back room of the store. Bishop then removed the gun from his pocket and fired at Mr. Porter. The first shot hit Mr. Porter in the head and caused him to fall to the ground. Bishop proceeded to fire a second shot, hitting Mr. Porter in the face. Mr. Porter subsequently died as a result of his injuries. Bishop fled after the shooting and Ms. Porter called 9-1-1. When the police arrived, and in the days immediately following the shooting, Ms. Porter described the shooter as a black male, approximately 6 feet tall and about 25 years of age, wearing a black hooded sweatshirt. (Bishop is white; Fails, on

7

the other hand, is African-American.) Ms. Porter told the police that her husband had been shot in the course of an attempted robbery. However, Ms. Porter's story quickly fell apart.

During the afternoon of March 1, Fails heard the description Ms. Porter provided to the police and became concerned that he might come under police suspicion. He went to a Baltimore County police station and reported that Ms. Porter had approached him about killing her husband in December 2009. Thereafter, Fails assisted the police in investigating the murder. While wearing a recording device, Fails made multiple contacts with Ms. Porter, telling her that he was nervous that he would become a suspect and requesting money to flee. Ms. Porter ultimately offered Mr. Fails $700 not to tell the police of her involvement in her husband's murder.

Ms. Porter was arrested on March 6, 2010, and subsequently interviewed by two detectives. Initially, she maintained that her husband was shot in the course of an attempted robbery. After learning that the detectives knew that she had been communicating with Bishop and Mowers throughout the early morning hours of March 1, she altered her version of events and stated that she had hired Bishop to beat her husband up for $400.

*Ms. Porter's Defense*

At trial, Ms. Porter's defense was that, after sustaining years of abuse at the hands of her husband, she was suffering from battered spouse syndrome, and was acting in self-defense when she arranged for his murder. In addition to the testimony that we have previously summarized, the defense introduced two expert witnesses to support the

8

theory that Ms. Porter was suffering from battered spouse syndrome: Neal Blumberg, M.D., a forensic psychiatrist, and Mary Ann Dutton, Ph. D., a clinical psychologist.

After being accepted by the court as an expert witness in the discipline of forensic psychiatry, Dr. Blumberg testified about his evaluation of Ms. Porter. Dr. Blumberg explained that, in evaluating a patient, he considers multiple sources of information in order to generate a reliable and accurate assessment. Dr. Blumberg testified that he: met with Ms. Porter five times, from 2011 to 2013; administered several psychological tests; reviewed information the police obtained, including Ms. Porter's 9-1-1 call as well as the interviews the police conducted with other individuals as part of their investigation and Ms. Porter's own statement to the police; conducted a forensic psychiatric examination, which involves a detailed family, medical, and legal history, as well as observations of the patient during the evaluation; and observed Ms. Porter's in-court testimony, as well as that of her daughter, Megan Porter.

As a result of his evaluation, Dr. Blumberg expressed the opinion that Ms. Porter was suffering from two different mental disorders, on or before March 1, 2010. The first was major depressive disorder, which Dr. Blumberg described as "severe." Dr. Blumberg explained that "[a] major depressive disorder is a biological illness in which the individual experiences not only depressed mood, but also loss of interest in activities they may have previously enjoyed as well as having a variety of [vegetative] symptoms of depression." Dr. Blumberg opined that Ms. Porter's depressive disorder was "recurrent," that is, she had experienced prior episodes of depression over time. The second mental disorder Dr. Blumberg identified was posttraumatic stress disorder, which Dr. Blumberg

9

explained, "is a disorder that develops in response to exposure to severe trauma," and, as a result of which, "the person experiences significant distress, anxiety, [and] depression."

Dr. Blumberg also provided the jury with the bases for his conclusions. He explained that "there [we]re certain things in [Ms.] Porter's background that made her . . . more vulnerable to developing both the problems with depression and PTSD." Dr. Blumberg began with Ms. Porter's childhood, noting that Ms. Porter was exposed to an abusive relationship between her mother and her mother's boyfriend, and that, as the youngest child in her family, she seemed to have developed an "impairment in her self-esteem." Dr. Blumberg's testimony then shifted to Ms. Porter's relationship with Mr. Porter. Dr. Blumberg explained that the relationship was initially positive, but that as time passed Mr. Porter became progressively more abusive. And, that Ms. Porter's response was to "view herself as worthless, [and] to do whatever she could to avoid making him angrier or upset with her." He noted that this further impaired Ms. Porter's self-esteem. Dr. Blumberg acknowledged that there were "good times" in the Porters' marriage but he explained that, during the periods in which Mr. Porter was particularly abusive, "[Ms. Porter] would experience periods of significant depression and anxiety." He explained further:

> She became super sensitive to his moods. She described sort of walking on eggshells around him and her coping style was not to assert herself or go to the police and kind of -- or say I'm leaving, I'm getting out of here. Her response to that progressive abuse was to cover things over, to deny, to repress, to sort of avoid thinking about what was going on with the hopes that, you know, things would settle down and those good times that they had in the past would return.

Finally, Dr. Blumberg addressed the escalation in violence in the year before Mr.

10

Porter's death, and that it was his belief that, during that time, "she became increasingly anxious and fearful for her life and safety. She had become increasingly depressed. She had felt hopeless and helpless to extricate herself from the relationship."

After identifying Ms. Porter's mental disorders, and explaining how he arrived at his diagnoses, Dr. Blumberg concluded that it was his "opinion to a reasonable degree of medical certainty that someone with [Ms.] Porter's psychological profile would meet the criteria for the battered spouse syndrome," as defined in the battered spouse syndrome statute, codified at Md. Code Ann., § 10-916 of the Courts and Judicial Proceedings ("CJP") Article.[8] Dr. Blumberg proceeded to discuss battered spouse syndrome, in

---

[8] The statute reads:

**§ 10-916. Battered Spouse or Battered Woman's Syndrome**

(a) *Definitions* — (1) In this section the following words have the meanings indicated.

(2) "Battered Spouse Syndrome" means the psychological condition of a victim of repeated physical and psychological abuse by a spouse, former spouse, cohabitant, or former cohabitant which is also recognized in the medical and scientific community as the "Battered Woman's Syndrome".

(3) "Defendant" means an individual charged with:

(i) First degree murder, second degree murder, manslaughter, or attempt to commit any of these crimes; or

(ii) Assault in the first degree.

(b) *Evidence and expert testimony* — Notwithstanding evidence that the defendant was the first aggressor, used excessive force, or failed to retreat at the time of the alleged offense, when the defendant raises the issue that the defendant was, at the time of the alleged offense, suffering from the Battered Spouse Syndrome as a result of the past course of conduct of the individual who is the victim of the crime for which the defendant has been charged, the court may admit for the purpose of

11

general, and the effects that it has on those who suffer from it. He stated:

> Battered spouse syndrome … [is] used to describe a reaction to recurrent spousal or partner abuse and the syndrome involves recurrent episodes in which there is an escalation of violence to the point where there is a particular violent episode followed by a cooling down period in which sometimes there are acts of contrition, but the situation calms down. . . . [B]attered spouse syndrome requires at least two of these cycles of an escalation of violence with an explosive outburst and then a cooling down period. As a result of the recurrent verbal and, in particular, physical abuse, the victim develops feelings of helplessness, hopelessness, which is referred to in the psychological literature as learned helplessness. Over time as a result of that abuse, the individual is feeling increasingly helpless or hopeless to rectify their situation. They often experience depression. They often experience severe anxiety. Those psychological conditions are in a sense paralyzing. They prevent them from being able to actively assert themselves, whereas a normal person might say hey, I'm not going to take that anymore and get out of it or call the police. As a result of the abuse, as a result of the depression and anxiety, women in particular or people with a battered spouse syndrome have difficulty and find it basically impossible to extricate themselves from the abusive relationship.
>
> . . .
>
> [T]he cases that generally involve violence to the abuser occur in the context of an escalation of the abuse. A belief that something is going to be more imminent in terms of harm, bodily harm or, in fact, death. It's often in that context that the abused spouse ultimately resorts to violence from her subjective point of view. And I'm using the "she" because [in] the vast majority of the cases the battered spouse is actually a woman. The wom[e]n ultimately believ[e] that the only way they can defend themselves, prevent themselves from further serious bodily harm or from death is to end the life of the abuser.
>
> . . .
>
> Well, by subjective, and what I'm talking about is Mrs. Porter's point of view. Again, when somebody has experienced extensive verbal and or physical abuse,

---

explaining the defendant's motive or state of mind, or both, at the time of the commission of the alleged offense:

(1) Evidence of repeated physical and psychological abuse of the defendant perpetrated by an individual who is the victim of a crime for which the defendant has been charged; and

(2) Expert testimony on the Battered Spouse Syndrome.

as a result of depression, as a result of the trauma that they have gone through, they may overreact to threats to their physical integrity. They may view the abusing spouse or others in their environment as being much more threatening than perhaps an objective viewer might see. So when we talk about the subjective point of view, we are talking about some of the distortions that are likely to have occurred with Mrs. Porter. It's not saying that the abuse she experienced was not real. I believe that it was, but it certainly could make her super sensitive to threats to her physical integrity and to perhaps overreact or overperceive those threats, feeling that she has to act in self-defense when, in fact, there might not be an objective reason for that.

The court accepted Dr. Dutton as an expert in the psychological condition of victims of repeated physical and psychological abuse by a spouse. She testified at length about domestic violence and the battered spouse syndrome, the psychological, emotional, and physical effects on the victim, myths associated with domestic violence and the battered spouse syndrome, strategies and coping mechanisms employed by victims, and the reasons—e. g., fear of the abuser, concern for children, economic worries—that can cause victims to stay in abusive relationships.

Dr. Dutton identified factors in Ms. Porter's history, e.g., that she was a neglected child, that she had had a child before entering into a relationship with Mr. Porter, that made her susceptible to the emotional dynamic that results in battered spouse syndrome. Dr. Dutton also expressed the opinion that, after interviewing Ms. Porter, reviewing her medical records and statements to the police, and observing her in-court testimony, Ms. Porter "experienced repeated abuse in the context of her marriage and that she was also experiencing and had experienced as a result of that, and other factors that contributed to it, consistent psychological effects related to it."

To support this conclusion, she pointed to a number of facts from Ms. Porter's

13

history, as well as her description of Mr. Porter, e.g., a neglected childhood, Mr. Porter's controlling behavior, his threats to kill her, his sometimes pointing a handgun at her when making those threats, his jealousy, and his prior physical violence towards her and the "incredible extent of humiliation and degradation" that she underwent during her marriage. As a result, in Dr. Dutton's view, there was a "kind of building up [of] the level of the threat . . . more intense, more frequent towards the end compared to throughout the rest of the marriage." Moreover, Dr. Dutton testified that "most women" who are the victims of domestic violence wish to "hide the level of abuse in their relationship." The following colloquy summarizes Dr. Dutton's conclusions:

> [Defense Counsel]: What about -- did you also review and take into consideration the mental health diagnosis, PTSD and the severe depression?
>
> A [Dr. Dutton]: Yes, I did.
>
> Q: And could those types of diagnoses affect an individual who is repeatedly abused, their perception of their options for getting out or stopping the abuse?
>
> A.: In two ways. Two ways in particular, maybe even more, but the two I'm thinking of are the experience of the fear is greater because of it. So someone who has symptoms of PTSD are likely to experience a subsequent event as even bigger because of that.
>
> The other thing is because of what trauma and PTSD do to our ability to think and reason and just process our range of options and being able to clearly think through, you know, what does it mean if I'm telling everybody I want him dead, what does that mean, why can't I just, you know, try to strategize some other way, there is just a sense of desperation as opposed to clear, calm, rational, logical thinking through. That's what trauma does. There is this sense of desperate action and also difficulty concentrating is one of the key symptoms of PTSD. It's not just about concentrating. It's about clearly -- thinking clearly.
>
> Q. And the hyperarousal or the hypervigilance that you mentioned earlier, how does that have any effect on one's perception of the danger that they are in?
>
> A. It would augment that perception.

14

Q. Augment it? Can you explain?

A. It would even make it bigger. I mean, there is a sense of is there some realistic danger, but then whatever that is, it would likely make their perception of that danger even bigger because of it.

Q. Is it consistent with one who has been abused repeatedly that they would believe the threats that are being launched against them?

A. Yes, especially if one has a gun to your head.

Stephen Siebert, M.D., a psychiatrist, testified as an expert witness for the State. Dr. Siebert testified that he had interviewed Ms. Porter at the State's request and concluded that she was suffering from a "mild depressive disorder" brought about by her lengthy pre-trial detention and stress related to the criminal charges pending against her. He opined that "there is no objective evidence for a posttraumatic stress disorder before the criminal offense." Dr. Siebert did not address whether Ms. Porter suffered from battered spouse syndrome.

Shortly before the close of evidence, the trial court and counsel engaged in an extensive discussion of the appropriate jury instructions, which we will summarize in Part I of this opinion. The jury returned a verdict of guilty for murder in the first degree, use of a handgun in the commission of a crime of violence, conspiracy to commit murder in the first degree, and three counts of solicitation to commit murder. The trial court sentenced Ms. Porter to life without the possibility of parole for murder, and merged the sentence for the related solicitation count with that sentence. The court also sentenced Ms. Porter to a term of life for conspiracy to commit first degree murder to run concurrently with her other sentences, imposed consecutive sentences of twenty years for the two additional solicitation counts, as well as a twenty year concurrent sentence for

use of a handgun in a crime of violence, for a total sentence of life plus forty years.

This appeal followed.

## I. The Imperfect Self-Defense Instruction

Pursuant to Md. Rule 4-325(c), "[a] court may, and at the request of any party shall, instruct the jury as to the applicable law and the extent to which the instructions are binding." A trial court's determination to give, or refuse to give, a requested jury instruction is reviewed for abuse of discretion. *Arthur v. State*, 420 Md. 512, 525 (2011). And, in reviewing a trial court's decision to grant, or deny, a requested instruction, we consider "(1) whether the requested instruction was a correct statement of the law; (2) whether it was applicable under the facts of the case; and (3) whether it was fairly covered in the instructions actually given." *Stabb v. State*, 423 Md. 454, 465 (2011).

With regard to the second factor—whether the instruction was "factually generated"—the Court of Appeals has been clear that the defendant must point to "'some evidence' sufficient to raise the jury issue." *Arthur*, 420 Md. at 525. The Court has described the some evidence standard as "a fairly low hurdle for a defendant," and has articulated the standard as follows:

> *Some evidence* is not strictured by the test of a specific standard. It calls for no more than what it says —"some," as that word is understood in common, everyday usage. It need not rise to the level of "beyond reasonable doubt" or "clear and convincing" or preponderance. The source of the evidence is immaterial; it may emanate solely from the defendant.

*Id*. at 526 (citation omitted).

Ms. Porter contends that the trial court's instruction to the jury misstated the law of imperfect self-defense in several ways. Deciding whether she is correct and, if she is,

16

whether the trial court's error is a basis for reversal, requires that we consider the relationship between the law of perfect and imperfect self-defense and the battered spouse syndrome and how, and indeed, if, these principles apply in a case involving murder for hire. We will explore these topics in order to provide context to the parties' appellate contentions.

*Self-Defense*

Maryland recognizes two forms of self-defense—perfect self-defense and imperfect self-defense. *State v. Smullen*, 380 Md. 233, 251 (2004). Perfect self-defense "operates as a complete defense to either murder or manslaughter[,]" and, where successful, results in acquittal of the defendant. *State v. Faulkner*, 301 Md. 482, 485 (1984). The Court of Appeals has articulated the elements "necessary to justify a homicide . . . on the basis of self defense" as follows:

> (1) The accused must have had reasonable grounds to believe himself in apparent imminent or immediate danger of death or serious bodily harm from his assailant or potential assailant;
>
> (2) The accused must have in fact believed himself in this danger;
>
> (3) The accused claiming the right of self defense must not have been the aggressor or provoked the conflict; and
>
> (4) The force used must have not been unreasonable and excessive, that is, the force must not have been more force than the exigency demanded.

*Id*. at 485-86.

Imperfect self-defense, on the other hand, arises where the defendant's "actual subjective belief . . . that he/she is in apparent imminent danger of death or serious bodily harm from the assailant, requiring the use of deadly force, is not an objectively reasonable belief." *State v. Marr*, 362 Md. 467, 473 (2001). Imperfect self-defense thus

17

differs from perfect self-defense in two significant respects—to claim imperfect self-defense the defendant's belief that (1) he/she was in "apparent imminent or immediate danger of death or serious bodily harm" and/or (2) "that the force employed [wa]s necessary to meet the danger" need not be objectively reasonable. *Id*. at 473-74. The Court of Appeals has expressly stated that "'[i]n all other respects, the elements of the two doctrines are the same.'" *Id*. at 474 (quoting *Burch v. State*, 364 Md. 253, 283 (1997)).

Moreover, unlike perfect self-defense, imperfect self-defense does not operate as a complete defense to criminal homicide. *Faulkner*, 301 Md. at 486. Rather, it negates the element of malice the State must prove to obtain a conviction for murder, and thus "mitigates murder to voluntary manslaughter." *Id*. The Court of Appeals has explained that "a defendant who commits a homicide while honestly, though unreasonably, believing that he/she is threatened with death or serious harm and that deadly force was necessary does not act with malice, and . . . cannot be convicted of murder." *Marr*, 362 Md. at 474. But, "because the killing was committed without justification or excuse, the defendant is not entitled to full exoneration and would be guilty of voluntary manslaughter." *Id*.

*The Battered Spouse Syndrome*

Maryland's Battered Spouse Syndrome Statute,[9] codified at Md. Code Ann. § 10-916 of the Courts and Judicial Proceedings ("CJP") Article, permits the introduction of

---

[9] The full text of the statute is set out in note 8 *supra.*

18

evidence that, at the time of the commission of certain crimes, the criminal defendant was suffering from battered spouse syndrome. *State v. Peterson*, 158 Md. App. 558, 586 (2004). The statute limits evidence of battered spouse syndrome to cases in which the criminal defendant is charged with first degree murder, second degree murder, manslaughter, or attempt to commit any of those crimes, and assault in the first degree. CJP § 10-916(a)(3); *Peterson*, 158 Md. App. at 587 n.6.

The statute defines "Battered Spouse Syndrome" as "the psychological condition of a victim of repeated physical and psychological abuse by a spouse, former spouse, cohabitant, or former cohabitant which is also recognized in the medical and scientific community as the 'Battered Woman's Syndrome'." CJP § 10-916(a)(2). And, with regard to the admissibility of evidence of battered spouse syndrome, §10-916(b) provides:

> Notwithstanding evidence that the defendant was the first aggressor, used excessive force, or failed to retreat at the time of the alleged offense, when the defendant raises the issue that the defendant was, at the time of the alleged offence, suffering from the Battered Spouse Syndrome as a result of the past course of conduct of the individual who is the victim of the crime for which the defendant has been charged, the court may admit for the purpose of explaining the defendant's motive or state of mind, or both, at the time of the commission of the alleged offense:
>
> (1) Evidence of repeated physical and psychological abuse of the defendant perpetrated by an individual who is the victim of a crime for which the defendant has been charged; and
>
> (2) Expert testimony on the Battered Spouse Syndrome.

This Court explained the significance of the enactment of Maryland's Battered Spouse Syndrome Statute in *Banks v. State*, 92 Md. App. 422, 429-30 (1992) (citations omitted; emphasis added) as follows:

> Before § 10-916 was enacted, trial judges often *excluded evidence* of past abuse and the Battered Spouse Syndrome as irrelevant, since the common law of self-defense holds that in order to invoke the defense, the defendant must not have been the first aggressor, nor must she have used more force than was necessary to repel the attack. The new statute *permits admission of this evidence*, "[n]otwithstanding evidence that the defendant was the first aggressor, used excessive force, or failed to retreat at the time of the alleged offense."

The Court of Appeals addressed the battered spouse syndrome at length in *Smullen v. State*, 380 Md. 233, 253-56 (2004). The battered spouse syndrome describes the psychological response of a person subject to a cyclical pattern of abuse,[10] physical and/or psychological, "that creates a hypervigilance on the part of the defendant and attunes the defendant to recognize a threat of imminent danger from conduct that would not appear imminently threatening to someone who had not been subjected to that repetitive cycle of violence." *Id.* at 270-71. In *Smullen*, the Court of Appeals explained

---

[10] In *State v. Peterson*, this Court described the cyclical pattern of abuse as follows:

> [T]he "battering cycle" of a battered spouse happens in three phases, which may vary in time and intensity: the "'tension-building' phase, in which minor incidents of physical, sexual, or emotional abuse occur"; the "acute battering incident, in which the batterer 'typically unleashes a barrage of verbal and physical aggression that can leave the woman severely shaken and injured'"; and the "contrition stage, in which the batterer apologizes, seeks forgiveness, and promises to change.

158 Md. App. at 588 (quoting *Smullen*, 380 Md. at 253-54).

the vigilance a victim of this pattern of abuse develops toward the behavior of the abuser as follows:

> The battered woman learns to recognize the small signs that precede periods of escalated violence. She learns to distinguish subtle changes in tone of voice, facial expressions, and levels of danger. She is in a position to know, perhaps with greater certainty than someone attacked by a stranger, that the batterer's threat is real and will be acted upon.

*Id*. at 255 (quoting *Bechtel v. State*, 840 P.2d 1, 12 (Okla. Crim. 1992)). "[O]ver time, the cycle becomes more intense, more frequent, more violent, and often more lethal." *Id*. at 254.

Evidence of battered spouse syndrome has been used to support claims of self-defense in cases where a victim of abuse kills his or her abuser. *Id*. at 256-57. As the Court explained in *Smullen*, "[i]t is the psychological response to that cycle of violence that helps explain why the defendant perceived a threat from objectively non-threatening conduct on the part of the victim and why, though apparently the aggressor, the defendant was actually responding to perceived aggression by the victim." *Id*. at 271.

Two hallmarks of the battered spouse syndrome, particularly relevant in the context of self-defense, are "[t]he abused victim's 'learned helplessness' and heightened sensitivity to the abuser's behavior." *State v. Peterson*, 158 Md. App. 558, 589 (2004). "Learned helplessness" describes the aspect of the syndrome whereby, "after repeated abuse, women come to believe that they cannot control the situation and thus become passive and submissive." *Smullen*, 380 Md. at 254. Learned helplessness thus "explains why the battered spouse does not leave the situation, or take some action against the abuser." *Peterson*, 158 Md. App. at 589. "Heightened sensitivity" captures the battered

spouse's sensitivity to the abuser's behavior, that is, the victim's ability to "sense the escalation in the frequency and intensity of the violence." *Smullen*, 380 Md. at 255. "'Heightened sensitivity' explains why the battered spouse may interpret as threatening conduct by the abuser that would appear non-threatening to others." *Peterson*, 158 Md. App. at 589.

### *The Relationship Between Self-Defense and the Battered Spouse Syndrome*

The appellate courts of this State have addressed the interaction of the law of self-defense and the battered spouse syndrome statute on three previous occasions: *State v. Smullen*, *State v. Peterson*, and *Banks v. State*, 92 Md. App. 422 (1992). In all three cases, both the Court of Appeals and this Court have been clear that CJP § 10-916 does not create an independent defense to the enumerated homicide and assault crimes. *Smullen*, 380 Md. at 251; *Peterson*, 158 Md. App. at 587; *Banks*, 92 Md. App. at 429. Instead, evidence of battered spouse syndrome enables the fact finder to undertake a more nuanced and comprehensive analysis of the state of mind elements of perfect and imperfect self-defense. *Smullen*, 380 Md. at 250-51; *Peterson*, 158 Md. App. at 587; *Banks*, 92 Md. App. at 429.[11]

---

[11] Our consideration of *Banks* ends at this point. In *Banks*, the defendant, at trial, asserted a defense that was "an amalgam of self-defense, hot-blooded response to provocation, and battered spouse syndrome." 92 Md. App. at 428 (quotation marks omitted). We discussed the battered spouse syndrome in passing. *Id.* at 428-30. The primary issue on appeal was evidentiary, *id.* at 426, and the defendant's conviction was reversed because this Court concluded that the trial court erred in permitting certain hearsay testimony. *Id.* at 438-39.

In *Smullen*, the Court of Appeals explained the interaction between the state of mind element and evidence of battered spouse syndrome as follows (emphasis in original):

> [Battered spouse syndrome] . . . , where applicable, merely requires a more careful and sophisticated look at the notion of imminent threat and what constitutes 'aggression,' of understanding that certain conduct that might not be regarded as imminently dangerous by the public at large *can* cause someone who has been repeatedly subjected to and hurt by that conduct before to honestly, even if unreasonably, regard it as imminently threatening. If, with that subjective belief, the defendant acts aggressively in defense, the defendant may be able to show that, even though the first *apparent* aggressor, he/she was responding in self-defense to an honestly perceived imminent threat of death or serious bodily harm. The syndrome, when applied in a proper setting, can thus, depending on the circumstances, support both the subjective honesty of the defendant's perception of imminent harm and the objective reasonableness of such a perception.

380 Md. at 250–51.

The Court, however, made it clear that, if applied in contexts outside of its "proper setting," the Battered Spouse Syndrome:

> then *does* become detached from the recognized defense of self-defense and assumes the status of a separate, independent defense to murder, manslaughter, maiming, or assault that we do not believe was intended by the Legislature in enacting § 10-916 and that we are not prepared to accept as part of our common law.

*Id.* at 251 (emphasis in original).

### *The Jury Instruction*

Throughout her trial, Ms. Porter sought to establish that she was suffering from battered spouse syndrome and was acting in self-defense when she arranged for her husband's murder. Accordingly, Ms. Porter requested that the court instruct the jury on

23

the battered spouse syndrome and to give the jury the Maryland Criminal Pattern Jury

Instruction on perfect and imperfect self-defense. [12]

---

[12] Maryland Criminal Pattern Jury Instruction 4:17.2(C) states:

> Voluntary manslaughter is an intentional killing, which is not murder because the defendant acted in partial self-defense. Partial self-defense does not result in a verdict of not guilty, but rather reduces the level of guilt from murder to manslaughter.
>
> You have heard evidence that the defendant killed (name) in self-defense. You must decide whether this is a complete defense, a partial defense, or no defense in this case.
>
> In order to convict the defendant of murder, the State must prove that the defendant did not act in either complete self-defense or partial self-defense. If the defendant did act in complete self-defense, your verdict must be not guilty. If the defendant did not act in complete self-defense, but did act in partial self-defense, your verdict must be guilty of voluntary manslaughter and not guilty of murder.
>
> Self-defense is a complete defense, and you are required to find the defendant not guilty, if all of the following four factors are present:
>
> (1) the defendant was not the aggressor [[or, although the defendant was the initial aggressor, [he] [she] did not raise the fight to the deadly force level]];
>
> (2) the defendant actually believed that [he] [she] was in immediate and imminent danger of death or serious bodily harm;
>
> (3) the defendant's belief was reasonable; and
>
> (4) the defendant used no more force than was reasonably necessary to defend [himself] [herself] in light of the threatened or actual force. [[This limit on the defendant's use of deadly force requires the defendant to make a reasonable effort to retreat. The defendant does not have to retreat if [the defendant was in his or her home] [retreat was unsafe] [the avenue of retreat was unknown to the defendant] [the defendant was being robbed] [the defendant was lawfully arresting the victim]].
>
> In order to convict the defendant of murder, the State must prove that self-defense does not apply in this case. This means that you are required to find the defendant not guilty, unless the State has persuaded you, beyond a reasonable doubt, that at least one of the four factors of complete self-defense was absent.

The State objected to the court instructing the jury on self-defense, arguing that "self-defense ha[d] not been adequately raised." Nonetheless, on the assumption that the court was going to instruct on self-defense, the State presented the court with an instruction it had crafted to clarify the elements the jury must find in considering imperfect self-defense. The State took issue with the following sentence in Maryland Criminal Pattern Jury Instruction 4:17-2(C) Voluntary Manslaughter (Perfect/Imperfect Self-Defense):

> "[If the defendant actually believed that [he] [she] was in immediate and imminent danger of death or serious bodily harm, even though a reasonable person would not have so believed, the defendant's actual, though unreasonable, belief is a partial self-defense and the verdict should be guilty of voluntary manslaughter rather than murder.]"

The State's concern was that the pattern instruction was misleading because the language suggests that the jury need only find that the defendant actually felt "they were

---

Even if you find that the defendant did not act in complete self-defense, the defendant may still have acted in partial self-defense. [If the defendant actually believed that [he] [she] was in immediate and imminent danger of death or serious bodily harm, even though a reasonable person would not have so believed, the defendant's actual, though unreasonable, belief is a partial self-defense and the verdict should be guilty of voluntary manslaughter rather than murder.] [If the defendant used greater force than a reasonable person would have used, but the defendant actually believed that the force used was necessary, the defendant's actual, though unreasonable, belief is a partial self-defense and the verdict should be guilty of voluntary manslaughter rather than murder.]

In order to convict the defendant of murder, the State must prove that the defendant did not act in complete self-defense or partial self-defense. If the defendant did act in complete self-defense, the verdict must be not guilty. If the defendant did not act in complete self-defense, but did act in partial self-defense, the verdict must be guilty of voluntary manslaughter and not guilty of murder.

25

in imminent and immediate danger of death or serious bodily harm," but makes no mention of the other elements necessary for a finding of self-defense. The State thus offered a revised imperfect self-defense instruction to include all of the elements required for a finding of imperfect self-defense. Ms. Porter objected to this instruction. She argued that the Battered Spouse Syndrome Statute, CJP § 10-916, eliminated some of the elements of self-defense in cases involving battered spouse syndrome, and that the pattern jury instruction reflected that. Accordingly, she argued that to add elements of perfect self-defense to the imperfect self-defense provision of the voluntary manslaughter instruction would conflict with CJP § 10-916.

In pertinent part, the court instructed the jury on self-defense as follows (the significant deviation from the pattern instruction is italicized):

> Self-defense is a complete defense to the crimes charged in this case and you are required to find the Defendant not guilty if all of the following four factors are present. First, that the Defendant was not the aggressor. Second, that the Defendant actually believed that she was in immediate and imminent danger of death or serious bodily harm. Third, that the Defendant's belief was reasonable. And fourth, that the Defendant used no more force than was reasonably necessary to defend herself in light of the threatened or actual force.
>
> In order to convict the Defendant of murder, the State must prove that self-defense does not apply in this case. This means that you are required to find the Defendant not guilty unless the State has persuaded you beyond a reasonable doubt that at least one of the four factors of a complete self-defense was absent. Even if you find that the Defendant did not act in complete self-defense, the Defendant may still have acted in partial self-defense. If the Defendant actually believed that she was in immediate danger of death or serious bodily harm, even though a reasonable person would not have so believed, *and the Defendant used no more force than was **reasonably** necessary to defend herself in light of the threatened or actual force, and that retreat from the threat was unsafe, and that she was not the aggressor,* the Defendant's actual, though

26

unreasonable belief, is a partial self-defense and the verdict should be guilty of voluntary manslaughter rather than murder.

In order to convict the Defendant of murder, the State must prove that the Defendant did not act in complete self-defense or partial self-defense. If the Defendant did act in complete self-defense, the verdict must be not guilty. If the Defendant did not act in complete self-defense, but did act in partial self-defense, the verdict must be guilty of voluntary manslaughter, not guilty of murder.

In assessing the Defendant's claims of self-defense in this case, you may, but are not required to, consider why and how in light of any pattern of abuse that you find existed, the Defendant may have honestly and perhaps reasonably perceived an imminent threat of immediate danger.

*Appellate Contentions*

In her brief, Ms. Porter contends that the trial court erred in departing from the pattern jury instruction on imperfect self-defense and in providing an "overly-limited battered spouse syndrome instruction." Ms. Porter raises three arguments in support of this contention. First, Ms. Porter asserts in her brief that, pursuant to CJP § 10-916(b), self-defense is available to a battered spouse, despite the fact that "some of the traditional hallmarks of self-defense are absent." Ms. Porter contends that because the court departed from the pattern instruction, the jury was not able to consider the evidence of battered spouse syndrome and could not find that she was acting in imperfect self-defense. Second, Ms. Porter argues that the court's instruction on battered spouse syndrome compounded the error because the instruction limited the jury's consideration of the evidence of battered spouse syndrome to the imminence of the threat, and thus "precluded the jury from considering the effect of [the] abuse on Ms. Porter's perception of who was the aggressor, the plausibility of retreat, and what constituted necessary

27

force." Third, Ms. Porter contends that the instruction rendered the evidence she presented in her defense meaningless.

The State concedes that the court erred in instructing the jury on imperfect self-defense. In its brief, the State identifies two incorrect statements of law in the court's instruction: first, to claim imperfect self-defense the defendant's use of force must have been reasonable, and second, that "the jury should apply an objective, rather than subjective, test to determine whether retreat from the threat was unsafe." Nonetheless, the State contends that Ms. Porter was not entitled to an instruction on imperfect self-defense, and thus that her conviction should be affirmed.

In its brief, the State makes several arguments in support of its position that the instruction, although incorrect, was not prejudicial to Ms. Porter. First, the State contends that Ms. Porter failed to identify "some evidence" as to each element required to make a claim of self-defense, and thus the instruction was not generated. Second, the State argues that the battered spouse syndrome statute does not create an independent defense to murder, but, rather, enables the jury to conduct a more sophisticated analysis of the elements of self-defense, particularly the defendant's state of mind and status as the aggressor. In the State's view, however, the statute does not "confer non-aggressor status upon a battered spouse who hires a third party to kill her partner." Finally, the State contends that the doctrine of self-defense, even self-defense in battered spouse syndrome cases, should not be extended to cases involving murder for hire. Relatedly, the State asserts that even if we do extend imperfect self-defense to murder for hire, Ms. Porter was not entitled to an instruction on imperfect self-defense because she failed to point to

"some evidence" that "at the time and place of the crime, she actually believed that she was in immediate and imminent danger of death or serious bodily harm" and that "although she appeared to be the aggressor, she in fact was not."[13]

*Analysis*

As we recounted above, the State has identified two errors of law in the imperfect self-defense instruction provided to the jury. According to the State, the instruction "required the jury to reject [appellant's] self-defense claim if [appellant] used more force than was reasonably necessary to defend herself in light of the threatened or actual force, and if retreat from the threat was not unsafe." We are not bound by the State's concession. *See*, *e.g.*, *Greenstreet v. State*, 392 Md. 652, 667 (2006) ("[A] party may not concede a point of law to the exclusion of appellate review, as necessary and proper to decide the case."); *Crown Oil & Wax v. Glen Construction*, 320 Md. 546, 567 (1990). Nonetheless, we agree with the State.

In order to successfully invoke the defense of imperfect self-defense, a defendant need not demonstrate that he used objectively reasonable force. *See State v. Marr*, 362 Md. 467, 473 (2001) ("The prospect of 'imperfect' self-defense arises when the actual, subjective belief on the part of the accused that he/she is in apparent imminent danger of

---

[13] Analogizing the facts of the case before us to *State v. Smullen*, 380 Md. 233 (2004), the State also argues in its brief that Ms. Porter failed to present a sufficient foundation for the introduction of the expert testimony on battered spouse syndrome, but that this was not prejudicial because "the erroneous instruction prevented the jury from exploiting that testimony to mitigate [Ms.] Porter's conviction of murder." We do not agree. Ms. Porter's testimony constituted a basis for the conclusions of her expert witnesses, Dr. Blumberg and Dr. Dutton.

death or serious bodily harm from the assailant, requiring the use of deadly force, is not an objectively reasonable belief. What may be unreasonable is the perception of imminent danger or the belief that the force employed is necessary to meet the danger, or both."). To the extent that the court's instruction suggested that the jury should apply an objectively reasonable standard to decide whether Ms. Porter could safely retreat, the instruction was also erroneous. It is the defendant's "actual, subjective belief . . . that he/she [wa]s in apparent imminent danger of death or serious bodily harm from the assailant," that is relevant. *Id*. That the instruction was erroneous is not, according to the State, the end of the matter. We now turn to the State's harmless error argument.

Except in cases of structural error, *see, e.g., State v. Waine,* 444 Md. 692, 705 (2015), an error in a jury instruction is not grounds for reversal if the error is "harmless." *Nottingham v. State*, 227 Md. App. 592, 610 (2016). In *Robinson v. State,* the Court of Appeals explained:

> When an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed harmless and a reversal is mandated. Such reviewing court must thus be satisfied that there is no reasonable possibility that the evidence complained of—whether erroneously admitted or excluded—may have contributed to the rendition of the guilty verdict.
>
> In performing a harmless error analysis, we are not to find facts or weigh evidence. Instead, what evidence to believe, what weight to be given it, and what facts flow from that evidence are for the jury to determine. Once it has been determined that error was committed, reversal is required unless the error did not influence the verdict; the error is harmless only if it did not play any role in the jury's verdict. The reviewing court must exclude that possibility beyond a reasonable doubt. To say that an error did not contribute to the verdict is, rather, to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed by the record. The harmless error rule has been

30

and should be carefully circumscribed. Harmless error review is the standard of review most favorable to the defendant short of an automatic reversal.

436 Md. 560, 563 (2014) (quotation marks, citations and ellipses omitted).

The State argues that the instructional errors were harmless because the concept of self-defense—whether perfect or imperfect and regardless of whether the defendant asserts that he or she suffered from battered spouse syndrome—should not have been presented to the jury through the court's instructions because Mr. Porter was not killed by Ms. Porter but by a hired assassin who was present at the gas station on the fatal morning solely through a conspiracy orchestrated by her. Therefore, according to the State, any error in the self-defense instruction is harmless. The State relies on *Evans v. State*, 28 Md. App. 640, 669 (1975) ("Erroneous instructions on non-issues are self-evidently immaterial."). As Judge Moylan explained for this Court in *Evans*,

> When a defendant has . . . no right even to take an issue before the jury, any instruction on such an issue (erroneous or not) is more than he is entitled to. When any consideration of an issue by the fact finder (court or jury) would properly be totally foreclosed, the defendant cannot complain that the issue was submitted under an unduly heavy burden upon him, since he has, even in that event, received more than he deserved.

*Id*. at 668.[14]

---

[14] As additional authority, the State cites, among other cases, *Newborn v. State*, 29 Md. App. 85, 87-92 (1975) (An erroneous jury instruction that purported to place burden on the defendant to prove mitigation, excuse, or justification was harmless where defendant denied agency and there was no evidence to generate issues of justification, excuse or mitigation.); and *Burko v. State*, 28 Md. App. 732 (1975) (A jury instruction that erroneously placed burden of proving mitigation on defendant was harmless error where defendant offered no defense).

Whether an instruction on self-defense is generated in a case involving battered spouse syndrome, where the battered spouse contracts for the murder of the abusive spouse, is an issue of first impression in Maryland. The only two Maryland cases that address the interaction of self-defense and battered spouse syndrome are *State v. Smullen* and *State v. Peterson*. We will look to the reasoning of the Court of Appeals and this Court for guidance in resolving the one before us.

In *Smullen*, the defendant, a teenager, "crept up behind [his father]," Warren, as he sat on the living room sofa, and repeatedly stabbed him with a butcher's knife. 380 Md. at 240. At trial, Smullen pursued perfect and imperfect self-defense. *Id*. at 244. He sought to support his claim of self-defense with evidence that his father had been physically abusive and that he suffered from battered child syndrome. *Id*. at 238, 244-47. The trial court excluded the testimony concerning the alleged physical abuse, on the ground that "there was no factual predicate for a self-defense argument," and the testimony regarding Smullen's psychological profile, on the ground that CJP § 10-916's provision for "co-habitants" did not include children. *Id*. at 244-47.

On appeal, the Court of Appeals first held "that the battered spouse syndrome, as recognized in § 10-916, applies as well to battered children." *Id*. at 268.[15]  However, the Court concluded that "there was no evidentiary basis" to apply the battered child

---

[15] In reaching this holding, the Court concluded "that the elements of the battered spouse syndrome that can help explain why a battered woman may perceive imminent serious harm from conduct that would not likely be regarded as imminently threatening by someone else and may regard her conduct as necessary to meet that threat apply equally with respect to battered children." 380 Md. at 271.

syndrome in Smullen's case. *Id*. at 274.[16] *Id*. at 271. In reaching these conclusions, the Court undertook a comprehensive analysis of the law of self-defense and battered spouse syndrome, and how the two operate together.

Among its observations, the Court noted that the cases in which evidence of battered spouse syndrome has been introduced to support a claim of self-defense are generally categorized as being "confrontational" or "non-confrontational." *Id*. at 257. As the names suggest, "confrontational" cases are those in which "the killing occurs when the defendant uses deadly force in response to a contemporaneous physical attack," and "non-confrontational" cases are those in which "the defendant kills her partner while he is sleeping or is otherwise distracted or incapacitated." *Id*. The Court explained that, in general, introduction of battered spouse syndrome evidence "proved less difficult" in confrontational cases because the reasonableness of the defendant's belief that she was "in imminent threat of death or serious bodily harm" was not at issue. *Id*. at 257-58. In non-confrontational cases, however, courts have been more hesitant to admit syndrome evidence because the subjective reasonableness element of self-defense is directly at issue where, at the moment of the killing, "the [victim] was not . . . directly confronting [the defendant] and may . . . even have been sleeping or completely passive at the time." *Id*. at 258. The Court also noted that there is, at least arguably, a "third category—that of

---

[16] That the evidence presented was not sufficient to provide a basis for the introduction of evidence of the battered spouse syndrome is not an issue in the case before us. Through the testimony of Ms. Porter and Megan Porter, the defense presented evidence of a pattern of severe psychological, physical, and verbal abuse that extended over the course of many years.

contract killing." In such cases, "'courts have unanimously refused to permit instructions to the jury on self-defense claims[.]'" 380 Md. at 274 n.5 (quoting John W. Roberts, *Between the Heat of Passion and Cold Blood: Battered Woman's Syndrome as an Excuse for Self-Defense in Non-Confrontational Homicides,* 27 LAW & PSYCHOL. REV. 135, 144 (2003)).

This Court addressed battered spouse syndrome and self-defense in the non-confrontational setting in *State v. Peterson*, a post-conviction relief case.[17] Peterson shot and killed her husband "as he was sitting in a chair in their living room, watching television." 158 Md. App. 558, 565 (2004). There was evidence that Peterson had been the victim of severe psychological and physical abuse throughout her twenty-six and a-half-year marriage. *Id*. at 567-68.

The issue before us was whether the post-conviction court erred in granting the petition on the grounds of ineffective assistance of counsel, where counsel "either failed to investigate battered spouse syndrome or abandoned evidence of the syndrome in putting on a defense." *Id*. at 564. In affirming the judgment of the post-conviction court, we explained that it was apparent that trial counsel did not understand that, in light of the facts, the "defense of imperfect self-defense only could be presented to the jury upon the introduction of evidence of battered spouse syndrome. *Id*. at 597. And, thus, "[w]hen trial counsel failed to introduce the evidence, the defense was kept from the jury, in a

---

[17] Peterson's convictions for first degree murder and use of a handgun in the commission of a felony were affirmed on direct appeal. *Peterson v. State*, 101 Md. App. 153, *cert. denied*, 336 Md. 559 (1994).

ruling that was legally correct." *Id*. We concluded that imperfect self-defense may be generated in a non-confrontation case, stating:

> If trial counsel had introduced factual and expert opinion evidence of battered spouse syndrome, which was available and which he knew or should have known was available, the defense of imperfect self-defense would have been generated, and would have been presented to the jury to decide. It is reasonably probable that, if that defense had been decided by the jury, the result of the proceeding would have been different.

*Id*.

This brings us back to the current appeal. Read together, *Smullen* and *Peterson* instruct that, with a proper evidentiary basis, the battered spouse syndrome is relevant to the state of mind elements for self-defense and imperfect self-defense in certain types of confrontational and non-confrontational homicides. However, these cases, as well as *Banks v. State*, make it clear that the Battered Spouse Syndrome Statute does not establish a new defense but rather permits "a more careful and sophisticated look" at the state of mind elements of self-defense: "[t]he syndrome, when applied in a proper setting, can thus. . . support both the *subjective* honesty of the defendant's perception of imminent harm and the *objective* reasonableness of such a perception." *Smullen*, 380 Md. at 250–51 (emphasis added). Neither *Smullen* nor *Peterson* addressed murder for hire. However, courts from other jurisdictions have done so.

Murder for hire cases fall into two categories: cases in which courts permit evidence of the battered spouse syndrome, but refuse to give an instruction on self-defense; and second, cases in which courts refuse to admit evidence of the battered spouse syndrome. We shall address each in turn.

Where the courts have concluded that defendants, who contracted for the murder of their spouses, were not entitled to an instruction on self-defense, they have reasoned that the defendants failed to present evidence that, at the time of the killing, there were in immediate or imminent danger. *People v. Yaklich*, 833 P.2d 758, 763 (Colo. App. 1991); *State v. Leaphart*, 673 S.W.2d 870, 873 (Tenn. Crim. App. 1983).

The facts in *Yaklich* are analogous to those in the case before us. Yaklich's husband was shot and killed in the driveway to his home, while the defendant was asleep inside the house. *Id.* at 759. "After her husband's death, [the defendant] received payment under his three life insurance policies, and she admitted that she paid [his assailants] $4,200 . . . for murdering her husband." *Id.* At trial, her defense was that she suffered from "battered woman syndrome," and thus "her actions were justifiable acts of self-defense." *Id.* The Colorado Court of Appeals concluded that the trial court erred in providing the jury with an instruction on self-defense because the evidence presented "was insufficient . . . to support her theory that she was in imminent danger at the time her husband was killed." *Id.* at 763. In reaching this conclusion, the court pointed to evidence that the defendant had (1) "approached several people about having her husband killed," (2) met with the ultimate assailant "several times over an eight month period," (3) "paid the [assailants] after they killed her husband," and (4) slept, inside the house, while "the contract killing was performed." *Id.*

The Court of Criminal Appeals of Tennessee arrived at the same conclusion in *State v. Leaphart*. There, the defendant paid her husband's assailants $10,000 for his murder, was present when he was beaten to death, and assisted in disposing of his body.

36

673 S.W.2d at 872. The evidence presented at trial established that the defendant "suffered repeated instances of physical abuse at the hands of [her husband]," but the court refused to give an instruction on self-defense. *Id*. at 872-73. In affirming the defendant's conviction, the Court of Criminal Appeals found no error on the part of the trial court because there was no evidence that the defendant was in imminent danger at the time of the murder. *Id*. at 873.

As to the second category of cases, Missouri has refused to permit the introduction of expert testimony on the battered spouse syndrome in cases involving murder for hire. *State v. Anderson*, 785 S.W.2d 596, 600 (Mo. Ct. App. 1990). In *Anderson*, the Missouri Court of Appeals explained that it was proper for the trial court to exclude expert testimony that the defendant was suffering from the battered spouse syndrome because its battered spouse syndrome statute requires a prima facie showing of self-defense before such evidence could be introduced. *Id*. The court reasoned that the defendant could not make a prima facie showing of self-defense where the defendant had "hired and lured the killers into the crime[,] [t]here was no evidence of self-defense of assaults of the husband when he was shot[, the defendant] had been talking for over three months prior to the murder about how to have her husband killed," and the defendant had paid the assailants out of the insurance proceeds she received after her husband's death.[18] *Id*.

---

[18] The Missouri Court of Appeals reached a similar conclusion in *State v. Martin*, 666 S.W.2d 895, 899 (Mo. Ct. App. 1984), prior to the passage of Missouri's battered spouse syndrome statute. The defendant sought to introduce expert testimony on the battered spouse syndrome to support her defense that she hired a third party to kill her husband as a means of self-defense, but it was excluded. *Id*. The Missouri Court of Appeals concluded: "The [trial] court did not err in ruling that [defendant] had failed to make a

We turn back to the case before us. We recognize that, at trial, Ms. Porter presented evidence that she had endured years of severe physical and psychological abuse at the hands of Mr. Porter, and that she was suffering from the battered spouse syndrome.

A "requested jury instruction is applicable if the evidence is sufficient to permit a jury to find its factual predicate." *Bazzle v. State*, 426 Md. 541, 550 (2012). "The threshold determination of whether the evidence is sufficient to generate the desired instruction is a question of law for the judge." *Id.* at 550 (citing *Dishman v. State,* 352 Md. 279, 292–93, 300 (1998)).

In our view, the factual predicate at issue is whether, *at the time Mr. Porter was killed*, Ms. Porter honestly, albeit subjectively, believed that she was in imminent, that is to say, immediate, danger of death or serious bodily harm. *Faulkner*, 301 Md. at 485. There was certainly evidence from which the jury could have found that Ms. Porter had felt herself in imminent danger of death on occasions in the weeks and months before Mr. Porter's death, but there was no evidence that she had such a belief on the morning of the murder.

Because there was no evidence that Ms. Porter was in fear of imminent danger of death or serious bodily harm at the time that Mr. Porter was shot, there was insufficient evidence to generate a jury instruction on self-defense. Ms. Porter thus never should have received an instruction on self-defense, and cannot now complain that the court's

---

prima facie showing of the elements of self-defense.  It follows that the court did not err in refusing to admit the expert testimony offered for the purpose of corroborating such a defense."  *Id*.

instruction was improper.[19] As this Court explained in *Evans*, "[w]hen a defendant . . .

has no right even to take an issue before the jury, any instruction on such issue (erroneous

or not) is more than he is entitled to." *Id*. at 668. Accordingly, we conclude that the

errors in the court's imperfect self-defense instruction were harmless.[20]

*The Battered Spouse Syndrome Instruction*

In her brief, Ms. Porter contends that the battered spouse syndrome "requires that

juries be permitted to find imperfect self-defense in cases where the defendant was the

aggressor, failed to retreat, and used excessive force." Certainly, our analysis in *Peterson*

suggests that trial counsel in that case should have pursued those arguments in that case

but the facts of *Peterson* are very different from those of the present case. Ms. Peterson,

who like Ms. Porter, presented evidence of a long history of spousal abuse, shot and

killed her husband while he was watching television. 158 Md. App. at 565. The shooting

---

[19] The Court asked the parties to submit supplemental briefing on harmless error, during oral argument. Both parties filed supplemental briefs.

[20] *See also, State v. Buggs*, 806 P.2d 1381 (Ariz. Ct. App. 1990) (Erroneous self-defense instructions were harmless error because there was no evidence that defendant's action was immediately necessary to prevent the harm he feared); *People v. Najera*, 41 Cal. Rptr. 3d 244 (Cal. Ct. App. 2006) (the court declined to reach appellant's contention that "sudden quarrel or heat of passion" language in voluntary manslaughter instruction was ambiguous because evidence that victim called defendant a "faggot" was insufficient to generate voluntary manslaughter instruction); *State v. Bush*, 297 S.E.2d 563 (N.C. 1982) (Erroneous self-defense instructions were harmless error because there was no evidence that defendant in fact believed he had to kill to prevent death or great bodily harm, nor was there any evidence that such a belief would have been reasonable.), *habeas corpus granted by Bush v. Stephenson*, 669 F. Supp. 1322 (E.D.N.C. 1986), *aff'd*, 826 F.2d 1059; *State v. Martin*, 278 S.E.2d 315 (N.C. Ct. App. 1981) (Any error in instruction on defense of habitation was harmless because evidence did not support a finding that defendant shot deceased while he was attempting to forcibly enter trailer).

was triggered by the fact that, a short time earlier, Peterson had seen her husband setting a fire in close proximity to some of their animals, *id.* at 575, some of whom he had previously brutalized. *Id.* at 572.

In contrast, Ms. Porter began soliciting acquaintances to murder Mr. Porter nine months before the crime was committed. She and Bishop finalized their agreement that Bishop would kill Mr. Porter about two weeks before the murder. On the day of the murder, she falsely alerted Mr. Porter that the alarm had gone off at the gas station, thus causing him to go to the gas station earlier than an ordinary work day. In the time between her call to Mr. Porter, which occurred at approximately 2:30 a.m., and the time at which Mr. Porter was shot, Ms. Porter participated in more than 50 phone calls with Bishop and Mowers. And, before she herself went to the gas station, Ms. Porter met Bishop, Mowers, and Brown, at a nearby McDonald's to ensure that Bishop still intended to shoot Mr. Porter. In our view, her active participation in an elaborate conspiracy to kill her husband places her outside of the class of persons for whose protection the Battered Spouse Statute was enacted.

## II. The Jury Note

Ms. Porter's second contention arises from the trial court's refusal to voir dire the jury, after receiving a jury note suggesting that, during their deliberations, the jurors were "speculating" about information not presented during trial. The text of the jury note is as follows (underlining in original):

> There is speculation in the jury room about information not in evidence.
> For example, was Ms. Porter motivated by money, as in a large life
> insurance policy. Also discussion of sentences for others involved in crime

including Walter Bishop and Susan Datta. Are these appropriate subjects for the jury?

Also, please clarify that <u>all</u> elements of a crime must be met to find guilty. Not just any or some elements.

After the court read the note into the record, counsel for Ms. Porter moved for a mistrial. Counsel expressed concern that the jury was using information obtained from outside sources regarding the sentences of other defendants. In response, the State argued that the note did not necessarily mean that the jurors had discussed Bishop's and Datta's sentences. Rather, the State suggested that the note could be an inquiry as to whether "[the jurors should] know what the sentences were or if there were sentences." The State asserted that the jurors should be instructed that "they shouldn't speculate as to what happened with any other Defendant in this case and it is not a proper subject for their consideration in determining the guilt or innocence of this particular Defendant." Defense counsel requested that, at the very least, the jurors be interviewed.

The court denied the motion for mistrial and refused to interview the jurors. The court instructed the jurors as follows:

> The next question that you have posed indicates that, "There is speculation in the jury room about information not in evidence. For example, was [Ms.] Porter motivated by money as in a large life insurance policy? Also discussions of sentences for others involved in the crime including Walter Bishop and Susan Datta." Then the ultimate sentence in this note is, "Are these appropriate subjects for the jury?" The answer to that question is no. You are not to speculate about things that you may have opinions on or beliefs about that are not in evidence in this case.
>
> I will repeat that during your deliberations, you must decide this case based only on the evidence that you and your fellow jurors heard together in the courtroom. That you are not to perform any outside research or investigation and you are certainly not to speculate about subject matters about which no evidence was introduced in this case.

On appeal, Ms. Porter asserts that the jury note suggested that there was misconduct on the part of the jury, and that the court abused its discretion in declining to voir dire the jurors, to determine whether there was impropriety and whether the jurors were capable of rendering an impartial verdict, before denying her motion for a mistrial. She identifies a number of improper actions, which she alleges one or more of the jurors *could* have undertaken, including: obtaining information about the convictions and sentences of Bishop and Datta, through news media or interactions with third parties; and failing to disclose during the initial voir dire that they had knowledge of such information. Ms. Porter contends that such knowledge by the jurors would have been prejudicial to her case because they might have been more concerned with ensuring that she received a harsher sentence than her co-conspirators, considering the defenses she presented.

The State counters that the court did not abuse its discretion. The State asserts that the content of the note referred to speculation, rather than receipt of information. The State directs our attention to the fact that the note said neither that the jury had information about a life insurance policy nor that the jury had information about Bishop's and Datta's sentences. Moreover, with regard to the life insurance policy inquiry, the State notes that there is "nothing in the entire record . . . that there is such information." And, with regard to Bishop's and Datta's sentences, the State suggests that "[i]n connection with the reading of Datta's and Coyle's testimony, the jury had been advised that there had been 'cases against them brought in this court' and so could infer that the same was true of Bishop." And, as a result, the State contends "[i]t was not unreasonable to conclude that the jury merely speculated about these co-conspirators' sentences,

42

without having any specific information as to what their sentences were." The State thus contends that the court properly exercised its discretion in declining the invitation to interview the jurors and, instead, providing the jurors with a "cautionary instruction."

Neither party disputes that, as a general matter, communications between jurors and outside sources are presumptively prejudicial because they implicate a criminal defendant's right to trial by an impartial jury, guaranteed by the Sixth Amendment to the United States Constitution and Article 21 of the Maryland Declaration of Rights. *See Dillard v. State*, 415 Md. 445, 454-55 (2010). Ordinarily, where there is such an allegation of misconduct, the trial court will voir dire the jurors to determine whether the contact was prejudicial. *Id*. at 461 ("An examination of the case law on issues of juror misconduct demonstrates that the court has a duty to fully investigate allegations of juror misconduct before ruling on a motion for mistrial, and that failure to conduct a voir dire examination of the jurors before resolving the issue of prejudice is an abuse of the trial judge's discretion.). Where, however, "there was no allegation that the jurors actually received prejudicial information, only [the suggestion] that it was possible," the Court of Appeals has upheld the trial court's determination with regard to prejudice, despite the fact that the court did not voir dire the jury. *Id*. at 463 (distinguishing the case before it from *Bruce v. State*, 351 Md. 387 (1998)).

Neither at trial, nor on appeal, has Ms. Porter directed the court to any evidence that so much as suggests that any juror consulted with any third party or outside source to acquire information about Datta's or Bishop's sentence. Ms. Porter's argument depends

entirely on the *possibility* of misconduct. We quote from Ms. Porter's brief (emphasis added; footnote omitted):

> In this case, the jury's note raised the *possibility* of several different kinds of misconduct. It is *possible* that one or more jurors had consulted news media during their deliberations and learned of the convictions and sentences of Bishop and Datta or that they had interacted with third parties who provided the information. The *possibility* exists that some jurors already knew of this information prior to trial, but failed to reveal it on voir dire. It is *possible* that the discussions of this extra-record evidence were protracted or they may have been brief. They may have involved one juror or all. "Because the content of the contact raised these *potential* serious issues, it was incumbent upon the trial judge to resolve the factual controversy that relates to the juror's ability to render an impartial verdict." *Dillard*, 415 Md. at 458 [.]

We cannot conclude that the court abused its discretion in refusing Ms. Porter's invitation to interview the jurors on the basis of speculation. In light of the information before it, the court's decision to do nothing beyond instructing the jurors not to speculate about matters not in evidence was reasonable.

### III. Ms. Porter's Statement to the Police

Ms. Porter's final contention is that the court erred in denying her motion to suppress her custodial statement. Ms. Porter identifies two grounds on which she asserts her statement should have been suppressed – that she did not validly waive her *Miranda* rights and that she invoked her right to counsel in the course of the interrogation. We shall address each in turn. We begin with our standard of review.

The Court of Appeals has articulated the standard pursuant to which we review an appeal from a denial of a motion to suppress as follows:

> In reviewing the Circuit Court's ruling on the motion [to suppress], we consider only the facts and information contained in the record of the suppression hearing.

44

> We view the evidence and inferences that may be reasonably drawn therefrom in a light most favorable to the prevailing party on the motion[.] We defer to the motions court's factual findings and uphold them unless they are shown to be clearly erroneous. We, however, make our own independent constitutional appraisal, by reviewing the relevant case law and applying it to the facts and circumstances of this case.

*State v. Luckett*, 413 Md. 360, 375 n.3 (2010) (internal citations and quotation marks omitted).

*The Waiver of Miranda Rights*

Ms. Porter's March 6, 2010, interview with the Baltimore County Police was recorded, and subsequently transcribed. Both the recording and the transcription were made part of the record before the suppression court. We begin with the exchange between Detective Hinton and Ms. Porter, during which she waived her *Miranda* rights:

> DET. HINTON: We've talked a couple of times. We've never gone over this but since you're up here we got some people that are going to be coming up here. I need to read you your rights. All right. I don't want you to freak out or anything.
>
> MS. PORTER: Why am I being arrested?
>
> DET. HINTON: You're not being arrested, all right.
>
> You're not under arrest right now. All right, but I have to read you your rights.
>
> MS. PORTER: Okay.
>
> DET. HINTON: All right. I want you to understand that we're going to go over some things again.
>
> MS. PORTER: Okay.
>
> DET. HINTON: All right. And I just want you to be truthful with me and just talk to me.
>
> MS. PORTER: I've been truthful with you.
>
> DET. HINTON: And I know you have.
>
> MS. PORTER: I have been.
>
> DET. HINTON: I know you have been and that's all we're going to do, just

talk over what we talked before.

MS. PORTER:  I know what this is about. It's my tenant, that's what it is. I know that's what it is. Because he thinks, because he and Ray were arguing, playing arguing, he thinks that they think it's him.

DET. HINTON:      Okay.

MS. PORTER:  And he wanted to go away. Let's do this and we'll talk. We'll talk.

DET. HINTON:      I'm going to read it and then I'm going to have you read it and then I'm going to have you sign, just saying that you understand it.

MS. PORTER:  What? I can't see it.

DET. HINTON: You can't, you need your glasses?

MS. PORTER:  They took everything. I can maybe make it out.

DET. HINTON: Okay, the first line says you have the absolute right to remain silent.

MS. PORTER:  Okay.

DET. HINTON: Do you understand that?

MS. PORTER:  Okay.

DET. HINTON:      Do you understand it though?

MS. PORTER:  Uh-huh.

DET. HINTON:      Okay, just initial here saying you understand. Anything you say can and will be used against you in a court of law.

MS. PORTER:  Okay.

DET. HINTON:      You understand that?

MS. PORTER:  Uh-huh.

DET. HINTON:      You have the right to talk with a lawyer at any time before or during any questioning. Do you understand that?

MS. PORTER:  Okay.

DET. HINTON: If you want a lawyer and cannot afford one, you can request the court to appoint a lawyer prior to any questioning. Do you understand that?

MS. PORTER:  Okay. That means if I need a lawyer they'll give me one.

DET. HINTON:      Uh-huh. And if, if you agree to answer questions, you may stop at any time and no further questions will be asked of you.

MS. PORTER:  Okay.

DET. HINTON: Do you understand that?

MS. PORTER: Uh-huh.

DET. HINTON: Can you read this clear enough to read it out to me?

MS. PORTER: All of it or -

DET. HINTON: Just that one line.

MS. PORTER: Okay, um, I have read and understand this explanation of my rights. My decision is to waive these rights and to be interviewed is free and voluntary on my part. Okay, what does that mean? That I'm waiving all of this?

DET. HINTON: Right. What it's saying is I have read you what your rights are.

MS. PORTER: Okay.

DET. HINTON: And that at any time you want to go and you say I want to invoke this right, you can. You can stop at any time.

MS. PORTER: I can sign this and say well I don't want to talk to nobody or whatever?

DET. HINTON: But signing this says that I explained your rights to you, that's what it says.

MS. PORTER: Okay.

DET. HINTON: And that you have read all of your rights and you understand exactly what we're talking about.

MS. PORTER: I've never had to do any of this. I don't know.

DET. HINTON: I know.

MS. PORTER: I don't know.

DET. HINTON: Today's date is the sixth.

MS. PORTER: March.

DET. HINTON: And it's twelve minutes to twelve.

MS. PORTER: Forty-eight?

DET. HINTON: Yes. Sorry. All right. Okay. So.

MS. PORTER: Tell me what's going on.

DET. HINTON: All right, what's going on is we just need to talk about what happened again. All right? Just explain it to us and just be as clear as you possibly can.

MS. PORTER: Okay.

The suppression court denied Ms. Porter's motion to suppress the statements she made to law enforcement, finding Ms. Porter's waiver of her *Miranda* rights to be "knowing and voluntary."[21]

On appeal, Ms. Porter argues that her waiver was invalid because it "was the product of deception and was made without a full understanding of her rights." In support of the contention that the waiver was the product of deception, Ms. Porter points to the fact that Detective Hinton stated that she was not under arrest. With regard to her contention that she did not understand her rights, Ms. Porter asserts that her statement, "I can sign this and say well I don't want to talk to nobody or whatever?" establishes a misunderstanding as to the implications of signing the waiver form. Ms. Porter asserts that Detective Hinton failed to resolve the misunderstanding when he told her that signing the form indicated that he had read her rights. And, further, that after he corrected himself and informed Ms. Porter that signing the form also indicated that she understood her rights, and she stated "I've never done any of this before. I don't know," he took no action to ensure that she understood her rights.

The State counters that Ms. Porter's waiver was both knowing and voluntary. In support the State directs us to the circuit court's conclusion that "'[t]here was no fatal trickery, deception or artifice employed by Detectives Hinton or Anderson, nor were there any fatal inducements, nor any coercion, during or before the Defendant's oral and

---

[21] Two suppression hearings were held regarding Ms. Porter's statements to law enforcement, one on January 5, 2011, and the other on December 8, 2011. The circuit court did not find grounds to suppress Ms. Porter's statements after either hearing.

written waivers of her right to remain silent and her right to counsel.'" Moreover, with regard to Ms. Porter's contention that Detective Hinton failed to properly advise her of her *Miranda* rights, the State contends that she mischaracterizes her exchange with Detective Hinton. And, as to Ms. Porter's contention that her waiver was the product of deception because Detective Hinton stated that she was not under arrest, the State directs us to the court's finding that "Detective Hinton's statement was a benign mistake…." The State also argues that, regardless when Detective Hinton told Ms. Porter that she was under arrest, a person in her circumstances "would reasonably have apprehended the gravity of her situation."

It is well established that a suspect in a criminal case must be advised of their Fifth and Fourteenth Amendment rights before he or she can be subject to a custodial interrogation. *State v. Luckett*, 413 Md. 360, 376-77 (2010). Accordingly, law enforcement personnel must advise a suspect of the following, before proceeding with an interrogation:

> [1] that he has the right to remain silent, [2] that anything he says can be used against him in a court of law, [3] that he has the right to the presence of an attorney, and [4] that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Id.* at 377-78 (quoting *Miranda v. Arizona*, 384 U.S. 436, 479 (1966)).

Where a suspect chooses to waive those rights, the burden is on the State to demonstrate that the waiver was "knowing, intelligent, and voluntary." *Id.* at 379 (citations and internal quotation marks omitted). In *Luckett*, the Court of Appeals explained this standard as follows:

49

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.

*Id.* (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

"In determining the constitutional adequacy of a suspect's waiver of the *Miranda* rights," we consider "the totality of the warnings." *Id.* "[I]f the warnings, viewed in the totality, in any way misstate the suspect's rights to silence and counsel, or mislead or confuse the suspect with respect to those rights, then the warnings are constitutionally infirm, rendering the purported waiver of those rights constitutionally defective and requiring suppression of any subsequent statement." *Id.* at 380.

The transcript, set forth in pertinent part above, illustrates that Detective Hinton informed Ms. Porter of each of her rights and that she orally confirmed her understanding after he read her each right. Additionally, Ms. Porter initialed next to each right to indicate that she understood the right and ultimately signed the form stating that she had been informed of her rights, that she understood them, and was waiving them. The suppression court found that Ms. Porter's waiver of her *Miranda* rights was knowing and voluntary. On appeal, Ms. Porter identifies individual phrases that, standing alone, might suggest that she did not understand her rights. After our independent review of the statements in context, we agree with the suppression court.

*Invocation of the Right to Counsel*

Before the suppression court, Ms. Porter identified four occasions on which she requested counsel during her interview with Detective Hinton and Detective Anderson.

50

On appeal, she takes issue with the inquiry she made regarding counsel just before she told the detectives that she had arranged to have Bishop beat her husband up. The following passage from Ms. Porter's March 6, 2010, interview illustrates the inquiry (emphasis added):

> DET. HINTON: At 1:49 a.m. you contact your brother. Okay? At 1:59 you talk to him again. At two o'clock in the morning you have a conversation with this guy who you don't know. This guy right here.
>
> MS. PORTER: Unless he was with my brother. I know the phone went dead and he -
>
> DET. ANDERSON: You're grasping.
>
> MS. PORTER: He said his phone went dead.
>
> DET. HINTON: You are completely grasping here. Are you understanding what we're saying to you?
>
> MS. PORTER: I think so.
>
> DET. HINTON: We know. We know. We're not stupid. We're really good. There are people running around this building, you can hear the stomping on the floors, running up and down the hallways.
>
> DET. ANDERSON: And it's a Saturday. It's usually empty.
>
> DET. HINTON: That doesn't happen. You know why? Because everything is coming to an end, Karla.
>
> MS. PORTER: I know.
>
> DET. HINTON: This is it. And I don't know how many times I've got to say it. I've been nothing but good to you.
>
> MS. PORTER: I know. *I guess I need to speak to an attorney then, right? I just, I don't know what else to say or do.*
>
> DET. HINTON: I just came in to hear what you had to say. I just wanted you to tell me exactly what was going on. That's why I came in here. To give you the benefit of the doubt. To listen to your version of the events that happened. And not to listen to what other people are going to -
>
> MS. PORTER: (inaudible) that Ray was hollering and screaming.
>
> DET. HINTON: But I need to know.
>
> MS. PORTER: And sometimes he would push me and a lot of people knew, you know, how he is. But he is such a good, good man. I just, I just wanted someone

to hit him for me. I didn't want any of this to happen. I didn't.

DET. HINTON: What happened, Karla?

Ms. Porter asserts that she made an unambiguous request for counsel and that Detective Hinton should have ceased the interview as soon as she made the request. In support of her contention, Ms. Porter analogizes her request to that of the defendant in *Ballard v. State*—"You mind if I not say no more and just talk to an attorney about this?"—which the Court of Appeals concluded was an unambiguous request for an attorney. 420 Md. 480, 494 (2011). And, with regard to her use of the word "right" at the end of her request, Ms. Porter asserts that it "indicated only that she, a battered woman, in [a] terrifying situation, was attempting to protect herself while still remaining deferential to an authority figure."

The State counters that "[Ms. Porter's] reference to needing a lawyer was not only qualified by the equivocal phrase 'I guess,' but was couched as a question." The State also asserts that Ms. Porter's statement is distinguishable from that of the defendant in *Ballard*. First, the State contends that rather than expressing a desire as the defendant in *Ballard* did through the phrase "you mind if," Ms. Porter, through the use of the phrase "I guess," was expressing uncertainty. Second, unlike the defendant in *Ballard*, who followed his request for counsel with the statement "I'd feel more comfortable with [a lawyer]," Ms. Porter's subsequent statement, "'I just, don't know what else to say or do,' only reinforced her previous expression of indecision…" And, third, the State distinguishes the nature of the request. Ms. Porter asked for the detectives' advice, and the detectives declined to respond. In contrast, in *Ballard*, the defendant decided he

needed a lawyer and asked the detective if he minded.

In *Ballard v. State*, the Court of Appeals addressed invocation of the right to counsel after waiver of the *Miranda* rights. 420 Md. at 488-91. The Court explained that where, in the course of the custodial interrogation, the accused invokes his right to counsel, further questioning is prohibited. *Id*. at 489. Quoting *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981), the Court stated:

> when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights . . . [He] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

*Id*. at 489.

> Where the accused seeks to invoke this right, however, the request for counsel "cannot be equivocal or ambiguous." *Id*. at 490. Rather, the Court explained: [i]nvocation of the *Miranda* right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning.
>
> Rather, the suspect must unambiguously request counsel. As we have observed, "a statement either is such an assertion of the right to counsel or it is not." . . . [A suspect] must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, *Edwards* does not require that the officers stop questioning the suspect.

*Id*. at 490 (quoting *Davis v. United States*, 512 U.S. 452, 459 (1994)) (emphasis in original). Notably, officers are not required to stop questioning where the request for

53

counsel is ambiguous or equivocal, though the courts have recognized that to ask clarifying questions "would be 'good police practice.'" *Id*. at 490 (quoting *Davis*, 512 U.S. at 461).

In *Ballard*, as mentioned above, the Court of Appeals concluded that the statement "You mind if I not say no more and just talk to an attorney about this," amounted to "an unambiguous and unequivocal assertion of the right to counsel." *Id*. at 491. In reaching its conclusion, the Court reasoned that "you mind if" is a phrase employed by a speaker "about to express a desire," that is, it is a colloquialism pursuant to which "it is reasonably assumed that the speaker is not actually seeking permission to do the thing desired or to have the desired thing occur." *Id*. at 492-93. The Court also explained that, even if the statement were a question, "the only question he reasonably posed was whether [the detective] 'mind[ed]' if [he] stopped talking and got an attorney." *Id*. at 493. Alternatively, the Court noted that any ambiguity would have been resolved by defendant's response to the detective's inquiry about what benefit an attorney would be – "I'd feel more comfortable with one." *Id*. at 494.

Moreover, the Court distinguished several cases in which the defendants' requests for counsel were deemed to be equivocal. *Id*. at 492. Two of those cases, *Davis v. United States* and *Minehan v. State*, 147 Md. App. 432 (2002), are instructive. In *Davis*, the Supreme Court could find "no reason to disturb th[e] conclusion" of the lower courts that the statement "Maybe I should talk to a lawyer" did not amount to a request for counsel. 512 U.S. at 462. And, in *Minehan*, this Court, despite finding that appellant was not subject to a custodial interrogation, noted in dicta that, "[appellant's] question, 'Should I

54

get a lawyer?,' was no more effective in invoking a Fifth Amendment right to counsel than the question in *Davis*." 147 Md. App. at 444. In distinguishing *Davis* and *Minehan*, the Court, in *Ballard*, described the "requests" for counsel as "suggest[ing] that the suspect *might* want a lawyer." *Ballard*, 420 Md. at 492 (emphasis in original). Neither statement "provide[d] any indication that the suspect, at the time the statement was uttered, actually desired to have a lawyer present for the remainder of the interrogation." *Id*.

Ms. Porter's statement—"I guess I need to speak to an attorney then, right? I just, I don't know what else to say or do*"*—is not substantively different than those addressed in *Davis* and *Minehan*. Ms. Porter's statement was not an "assertion of the right to counsel;" rather, as the *Ballard* Court described the statements in *Davis* and *Minehan*, it merely "suggest[ed] that [she] might want a lawyer." Accordingly, Detectives Hinton and Anderson were not required to cease the interrogation, and had no obligation to inquire as to whether Ms. Porter wished to exercise her right to counsel. We find no error in the court's refusal to suppress Ms. Porter's custodial statement.

**THE JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE COUNTY ARE AFFIRMED. APPELLANT TO PAY COSTS.**

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1916

September Term, 2013

_____

KARLA LOUISE PORTER

v.

STATE OF MARYLAND

_____

Kehoe,
Graeff,
Friedman,

JJ.

_____

Dissenting Opinion by Friedman, J.

_____

Filed:  October 25, 2016

The State concedes, and we all agree, that the charge to the jury on imperfect self-defense was defective. The question, therefore, was whether Ms. Porter produced "some evidence" to generate that charge. The majority finds that she did not and therefore affirms Ms. Porter's conviction. I disagree and therefore dissent.[1] I think that there are three aspects to our disagreement: (1) the "some evidence" standard; (2) the role of imminence; and (3) the availability of a self-defense instruction in a contract killing.

I.

My colleagues correctly note the "some evidence" standard, *ante* at 18, but it is worth emphasizing just how easy to satisfy that standard is intended to be. Because it can be satisfied on the uncorroborated testimony of the defendant, *Arthur v. State*, 420 Md. 512, 526 (2011) (citing *Martin v. State*, 329 Md. 351, 359 (1993)), and because the trial judge is not supposed to be making a credibility determination, *id.*, it really is that if a defendant says that she is relying on a defense, she gets the appropriate instruction. *See also Wright v. State,* 70 Md. App. 616, 620 (1987) (defendant entitled to instruction even if defense is "well nigh incredible as a matter of fact"). Thus, if she says she was under duress, she gets

---

[1] To be explicit, I would reverse Ms. Porter's convictions and remand for a new trial. As a result, I would not need to reach the issues of the jury note or her statements to the police (although I agree wholeheartedly with the majority's analysis of those issues). I would also reject the State's alternative argument (which the majority is not compelled to reach) that the erroneous jury instruction affected only Ms. Porter's murder conviction but did not infect her convictions for conspiracy to commit murder and solicitation to commit murder. To my mind, the failure to properly instruct on the issue of imminence infected all of the convictions.

a duress instruction; if she says that she was acting in self-defense, she gets a self-defense instruction. There is no more to it than that.[2]

## II.

I read *Smullen* as establishing a two-step procedure in battered spouse syndrome cases:

> When a defendant claiming self-defense offers foundational evidence which, if believed, would establish the requisite *pattern of abuse* sufficient to provide a base for an expert opinion as to the battered spouse/child syndrome, it should be admitted, so that it can be followed by the expert testimony. The syndrome evidence would then play its proper role in explaining why and how, in light of that pattern of abuse, the defendant could honestly, and perhaps reasonably, perceive an imminent threat of immediate danger.

*Id*. at 273 (emphasis added). As I read *Smullen* then, once the defendant produces sufficient evidence of a pattern of abuse, then expert testimony becomes admissible to explain how a person that is subject to such a pattern of abuse, might perceive herself to be in "imminent threat of immediate harm" despite that others who are not themselves the victims of this pattern of abuse might not find it so. At that point, the defendant is entitled to an appropriate instruction and the jury is entitled to consider self-defense.

In *Smullen*, the defendant failed at Step One: he didn't produce sufficient evidence of a pattern of abuse. *Id.* at 273-74. Therefore, he never got to Step Two. Because the defendant in *Smullen* didn't get there, the *Smullen* majority opinion only provides hints

---

[2] And *Smullen* is not to the contrary. In *Smullen*, the majority and dissent sparred over the question of whether the defendant had generated "some evidence" of a pattern of abuse sufficient to require the admissibility of expert testimony regarding the battered child syndrome, but both sides agreed that "some evidence" was the correct evidentiary standard. *Smullen*, 380 Md. at 274 n.14 (majority), 277-279, 285 (dissent).

about Step Two. But I read the quote from *Smullen*, above, as saying that expert testimony alone, if believed, can explain why someone subject to a pattern of abuse, would perceive imminence differently than a person who has not been subject to such a pattern of abuse.

Applying this procedure to the current case, the trial judge found, and I would affirm, that Ms. Porter produced evidence of a pattern of abuse (Step One). At that point, expert testimony became admissible to explain how she might have perceived herself in "imminent threat of immediate danger" despite that others, who are not themselves victims of this pattern of abuse, might not find it so (Step Two). While the expert testimony that Porter produced at Step Two might have been clearer, *ante* at 14-15, I think it was sufficient. Thus, I think that she is entitled to a correct jury instruction and the jury is entitled to consider whether it thinks she acted in self-defense, perfect or imperfect.

The majority disagrees and finds that Ms. Porter's evidence of imminence was insufficient, holding that while she might have established imminence "in the days and weeks before" the murder, she failed to establish imminence on "the morning of" the murder. *Ante* at 42. I think this is wrong in two, closely-related dimensions. First, on a procedural level, I think *Smullen* establishes that in this realm, imminence is a subject for expert testimony and then a jury question, not an appropriate determination for appellate judges. More importantly, however, the whole point of the battered spouse defense is that, because of a pattern of abuse, a defendant might perceive the imminence of danger differently from someone who has not experienced this pattern of abuse. *Id*. at 270-71 ("the battered spouse/child syndrome is founded upon a repetitive and increasingly frequent and severe cycle of violence that creates a hypervigilance on the part of the defendant and

attunes the defendant to recognize a threat of imminent danger from conduct that would not appear imminently threatening to someone who had not been subjected to that repetitive cycle of violence."); *see also State v. Janes*, 121 Wash. 2d 220, 241-42 (Wash. 1993) ("That the triggering behavior and the abusive episode are divided by time does not necessarily negate the reasonableness of the defendant's perception of imminent harm. Even an otherwise innocuous comment which occurred days before the homicide could be highly relevant when the evidence shows that such a comment inevitably signaled the beginning of an abusive episode."). Thus, I think that the question of imminence is properly a subject for expert testimony, not appellate speculation, and then it becomes a jury question.[3]

## III.

Finally, I do not read *Smullen* as foreclosing the possibility of a battered spouse defense when the mechanism of death is contract killing. As the majority opinion reports, Judge Wilner, writing for the majority in *Smullen*, noted that there are two categories of battered spouse cases:

> The "confrontational" category, where the killing occurs when the defendant uses deadly force in response to a contemporaneous physical attack; and the "non-confrontational" category, where the defendant kills her

---

[3] The majority also seems concerned that it is required to reject Ms. Porter's battered spouse defense lest it be criticized, as this Court was in *Smullen*, for allowing the syndrome to "become detached from the recognized defense of self-defense and assume the status of a separate, independent defense." *Ante* at 26 (quoting *Smullen* at 251). Not only do I not share that concern, I believe that the application that I have proposed above follows precisely the traditional defense of self-defense, modified only with "a more careful and sophisticated look at the notion of imminent threat and what constitutes 'aggression.'" *Smullen*, 380 Md. at 250.

- 4 -

partner while he is sleeping or is otherwise distracted or incapacitated.

*Smullen*, 380 Md. at 257. Judge Wilner then noted in a footnote that "[o]ne writer has argued that there is a third category—that of contract killing," *id*. at 257 n.5, and that the same writer has found that "in … cases … of a hired killer 'courts have unanimously refused to permit instructions to the jury on self-defense claims.'" *Id*. (quoting John W. Roberts, *Between the Heat of Passion and Cold Blood: Battered Woman's Syndrome As An Excuse For Self-Defense in Non-Confrontational Homicides*, 27 LAW & PSYCHOL. REV. 135, 141 (2003)). Those comments were obviously *dicta* in *Smullen*, which didn't involve a contract killing, and hardly constitute a ringing endorsement of Professor Roberts's view.[4] It is hard to miss Judge Wilner's skepticism about non-confrontational applications of the battered spouse syndrome: "non-confrontational settings [that] suggest an ambush … severely strain[], and in many cases will rupture, the relationship between the syndrome and the defense of self-defense, perfect or imperfect." *Id*. at 264-65. But he does not foreclose the possibility.

Nothing about the text of CJP §10-916 mentions different categories of cases (other than that it is available only in homicide crimes or assault in the first degree, CJP §10-916(a)(3)), and nothing in the text suggests that it is limited to only one category of battered spouse cases or that it is unavailable in another class. It would have been extraordinary for

---

[4] It hardly needs remark that the "unanimous" view of three of our sister intermediate state courts of appeal are not binding on us. *Ante* at 40-41 (citing *People v. Yaklich*, 833 P.2d 758, 763 (Colo. App. 1991); *State v. Leaphart*, 673 S.W.2d 870, 873 (Tenn. Crim. App. 1983); *Anderson v. State*, 785 S.W.2d 596, 600 (Mo. Ct. App. 1990)).

the *Smullen* majority to read into the statute categorical limitations—prohibitions on the use of the battered spouse defense in non-confrontational cases or in contract killings—in the absence of textual authority. Thus, I think the better reading of *Smullen* is that Judge Wilner was observing not that the defense is unavailable as a matter of law in a category of cases, but rather that a jury might not believe the testimony that a defendant was acting in self-defense in non-confrontational cases.

I also don't think it is appropriate to draw such a categorical line, because I infer from the testimony of the experts here that victims of the battered spouse syndrome, conditioned by their abusers to feel weak, unempowered, and impotent, might, as a direct result of their victimology, select to murder by contract killer rather than do it themselves. Thus, I would view murder for hire as a particularly attenuated subspecies of the non-confrontational category of battered spouse cases. *Ante* at 37-38 (discussing non-confrontational-type cases). As with all of these non-confrontational type cases, including murders where the victim (and batterer) is sleeping or otherwise incapacitated, the question for the jury to decide is whether the attenuation was too far and the threat was no longer imminent.

In summary, I think Ms. Porter elicited some evidence of a pattern of abuse, which made her expert testimony regarding imminence admissible. Together, these elements entitled her, in my view, to a correct jury instruction so that the jury might determine if it believed her self-defense theory of the case.